**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2002-CT-00261-SCT**

*CHRISTOPHER BURCHFIELD*

*v.*

*STATE OF MISSISSIPPI*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 2/15/2002 |
| TRIAL JUDGE: | HON. GEORGE B. READY |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JACK R. JONES, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BILLY L. GORE |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/04/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     Methamphetamine, or "crystal meth," is not difficult to manufacture.  The ingredients may be extracted from widely-available (and otherwise legal) products such as flashlight batteries and non-prescription sinus and cold medication.[1]  This unfortunate fact led our Legislature to enact several laws which, under certain circumstances, criminalize the possession of large quantities of one or more of these ingredients.  For instance, the statute in issue in this case states:

---

[1]The active ingredient in many sinus and cold medications such as Sudafed is ephedrine, or pseudoephedrine.

> It is unlawful for any person to purchase, possess, transfer or distribute two hundred fifty (250) dosage units or fifteen (15) grams in weight (dosage unit and weight as defined in Section 41-29-139) of pseudoephedrine or ephedrine, knowing, or under circumstances where one reasonably should know, that the pseudoephedrine or ephedrine will be used to unlawfully manufacture a controlled substance.

Miss. Code Ann. § 41-29-313(2)(c) (Rev. 2001).

¶2.     Additionally, it is not uncommon for law enforcement officials to request that drug stores, grocery stores, and other outlets be on the lookout for, and report, persons purchasing large quantities of products such as Sudafed.

¶3.     In the case before us today, the defendant was reported by a Walgreens clerk to have purchased a quantity of pills containing pseudoephedrine. He was arrested and convicted of possession of the pseudoephedrine, with knowledge that it would be used to manufacture a controlled substance. He now challenges the conviction, asking us to decide several issues, including one of first impression in Mississippi.

**FACTS**

¶4.     On May 29, 2001, a Walgreens clerk called officer Brian Bradley[2] to report that two white males had just purchased a quantity of pseudoephedrine, and were leaving the parking lot in a silver Cadillac with Arkansas license plates, traveling westbound on Goodman Road from Highway 51. Officer Bradley reported the call to dispatch, who reported it to on-duty officers.

¶5.     Patrol Sergeant Kevin Thomas heard the call and immediately proceeded to Goodman Road, where he spotted the vehicle and initiated a traffic stop. While talking with the driver of the Cadillac, officer Thomas noticed a Walgreens bag on the back seat containing two boxes of ephedrine. Officer Thomas requested, and received, permission to search the vehicle, in which he found two different bags of

---

[2]Officer Bradley, supervisor over narcotics investigations of the Horn Lake, Mississippi, police department, received the call at his home.

ephedrine, one from Walgreens and the other from Seessels, together containing 864 unit dosages (pills) of ephedrine. One of the bags was located in the trunk.

¶6.    Officer Bradley then arrived on the scene and questioned Burchfield, who stated that he and his companion were in the area buying pseudoephedrine, or ephedrine, for the purpose of reselling it. Burchfield was arrested and indicted for possession of 250 dosage units of ephedrine or pseudoephedrine, with knowledge that it would be used to manufacture a controlled substance.

¶7.    Burchfield's case came to trial on February 13, 2002. He was convicted and, even though he was a first offender, was sentenced to five years, the maximum for the crime.

¶8.    Burchfield's appeal was assigned to the Court of Appeals which affirmed the conviction. *Burchfield v. State,* No. 2002-KA-00261-COA, 2004 WL 1244746 (Miss. Ct. App. 2004). Burchfield then filed with this Court his petition for writ of certiorari, which we granted in order to clarify an issue of first impression. We now finally decide the case by addressing four of the six issues raised by Burchfield.

## ANALYSIS

*1. Motion to suppress*

¶9.    Burchfield claims the police lacked probable cause to make the stop and search the vehicle in which he was a passenger. We looked at this precise question recently in *Walker v. State*, 881 So.2d 820, 826 (Miss. 2004), where, speaking thorough Presiding Justice Waller, we stated that

> [t]he constitutional requirements for an investigative stop and detention are less stringent than those for an arrest. An investigative stop of a suspect may be made so long as an officer has "a reasonable suspicion grounded in specific and articulable facts, that a person he encounters was involved in or is wanted in connection with a felony." *Floyd v. City of Crystal Springs*, 749 So.2d 110, 114 (Miss.1999)). Put another way, the investigative stop exception to the Fourth Amendment warrant requirement allows a police officer to conduct a brief investigative stop if the officer had a reasonable suspicion, based

3

upon specific and articulable facts which, taken together with rational inferences from those facts, result in the conclusion that criminal behavior has occurred or is imminent. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878-79, 20 L.Ed.2d 889, 904-05 (1968).

¶10.    We also faced almost identical facts in *Williamson v. State*, 876 So.2d 353 (Miss. 2004), wherein we stated:

> The United States Supreme Court has held that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Florida v. J.L* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (quoting *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).
>
> This Court has also held that "[r]easonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability." *Floyd v. City of Crystal Springs,* 749 So.2d 110, 118 (Miss.1999). "Reasonable suspicion is dependent upon the content of the information possessed by the detaining officer as well as its degree of reliability." *Id*. "Both factors – quantity and quality – are considered in the 'totality of the circumstances'

 *Williamson v. State*, 876 So. 2d at 355.

¶11.    In the case before us today, the police were informed by a Walgreens clerk that two white males in a Cadillac with Arkansas license plates had each purchased a quantity of pills containing pseudoephedrine and were leaving the parking lot, westbound on Goodman Road from Highway 51. Within minutes, officer Thomas spotted two white males in a Cadillac with Arkansas license plates, on Goodman Road. Under these circumstances, we find (as we did in *Walker* and *Williamson*) that officer Thomas had a reasonable suspicion which justified an investigatory stop. After the stop, officer Thomas personally observed on the back seat a sack containing packages of pills containing pseudoephedrine. He then obtained permission for the search which yielded the evidence used against Burchfield. The conduct of the Horn Lake police was entirely appropriate and constitutional, and this assignment of error is, therefore, without merit.

4

## 2. Expert testimony in crystal methamphetamine production

¶12.   Officer Johnny Cox was called as an expert to testify about the manufacture of methamphetamine and to explain the ingredients and steps necessary to produce the drug. Burchfield claims this testimony was prejudicial, particularly since he was not on trial for manufacturing the drug. Raising a pretrial objection to the proposed testimony of Officer Cox, Burchfield's counsel stated:

> And last, Your Honor, it's my understand that they're going to call Johnny Cox . . . as an expert in this meth stuff, and its going to a test – you've got to scientifically accept testimony which is relative for probative value, and we challenge that as not being a scientifically based accepted type of expert witness, which would be probative in this case. So based on the Fry ruling, we ask the Court to exclude that evidence.

The prosecutor responded to the request by stating that Officer Cox would be called "to explain to the jury exactly how the controlled substance Methamphetamine is manufactured and specifically what part of that process the role of Pseudoephedrine, which is the primary agent."

¶13.   Burchfield's counsel responded by saying, "He's either in possession of it or not, and he was trying to manufacture and make Meth I think would be prejudicial." He then concluded the discussion by stating that the prosecutor had disclosed to him that Cox would be called "basically for that purpose."

¶14.   It appears that Burchfield's counsel is taking the position that, since Burchfield has not been charged with the manufacture of ephedrine or pseudoephedrine, any testimony about the manufacture of the drugs would be unnecessary and would unfairly prejudice Burchfield.

¶15.   However, one of the elements necessary for the State to prove against Burchfield was that he knew, or reasonably should have known, that the ephedrine would be used to manufacture a controlled substance. Officer Cox was properly qualified to provide the testimony. Furthermore, he went no further than was necessary to demonstrate a link between the pseudoephedrine found in the car, Burchfield's

statement that he intended to sell the pills, and the manufacture of a controlled substance. This assignment of error has no merit.

### 3. Use of label to identify the pseudoephedrine

¶16. As part of its prima facie case, the State was required to prove, beyond a reasonable doubt, that the pills found in the back seat and trunk contained pseudoephedrine or ephedrine. Rather than having the pills analyzed by a toxicologist, the State offered the package labels which disclosed the ingredients – one of which was pseudoephedrine. Because Burchfield claims to have objected to this evidence, we find it necessary to track the issue from the pretrial motions to the admission into evidence of the boxes containing the pills.

¶17. Prior to trial, Burchfield raised several issues, none of which related to the use of the label to identify the pseudoephedrine. He filed and argued a motion to suppress, based upon search and seizure issues. At the conclusion of voir dire, his counsel reminded the trial judge that he had "a pretrial motion to suppress the evidence and a car stop." Then, after confirming to the court that the motion concerned "probable cause for the stop," Burchfield's counsel stated, "And then any and all evidence flowing from a search and seizure but that will be addressed on a motion for directed verdict, which is the easiest way to handle it." He also raised a hearsay objection related to possible statements made by a co-defendant. None of these pretrial motions or discussions mentioned the use of the label to identify the pseudoephedrine.

¶18. The State's first witness was Officer Kevin Thomas, who gave the following testimony, without objection:

> I asked the driver if he had anything illegal in the vehicle, and he said no. Then we asked
> for a consent to search the vehicle; and as a result, it netted at approximately 864 unit
> dosages of Ephedrine. . . . There was more Ephedrine in the trunk of the vehicle.

6

¶19.    On cross-examination, Burchfield's counsel did not challenge the characterization of the pills as "Ephedrine." And on redirect, the prosecutor asked, "And where were the Pseudoephedrine pills located in the car that you first saw?" Officer Thomas replied, "The back passenger side seat." Again, no objection.

¶20.    The next witness was Officer Brian Bradley, who testified:

Q.      Did you talk with Mr. Burchfield regarding the Ephedrine
         that was found in the car?

A.      Yes, Ma'am.

Q.      Did he make any statements to you at that time?

A.      He made the statement that they were over in this area
         buying the Pseudoephedrine or Ephedrine for the purpose
         to resell it.

Q.      Did he tell you where he was going to resell it?

A.      No, ma'am.

Q.      Once you arrived on the stop, were you actually – did
         you view the Ephedrine that was found?

A.      Yes, Ma'am.

Q.      And during the course of the investigation that night, did
         you seize the Ephedrine that was found in the car as
         evidence?

A.      Yes, Ma'am. I did.

¶21.    At that point in the trial, Burchfield had raised no objection to the identification of the pills as ephedrine or pseudoephedrine. The prosecutor then asked the following question regarding the evidence bags: "Actually, are these two different things here, this information attached on the front?" Officer Bradley replied, "These are receipts that were in the bags where they purchased the Ephedrine and then that's the

Ephedrine or Pseudoephedrine itself." He then verified that both the receipts and pills were found in the vehicle at the time of the stop. The following exchange then took place:

> BY MS. AMIS (the prosecutor): Your Honor, at this time I would like to separate these and make them two separate exhibits to this witness's testimony.

> BY THE COURT: I think that's appropriate. Any objection?

> BY MR. JONES (Burchfield's counsel): Same objection made earlier, which the Court will address.

> BY THE COURT: Well, what about the separation of them?

> BY MR. JONES: Oh, no, that's fine. I understand that.

The pills, in their original packaging, and receipts of purchase, were then received into evidence. At this point, Burchfield had raised no objection to the identification of the pills as ephedrine or pseudoephedrine by the two police officers. Nor had he raised any objection to the introduction of the packages of pills or receipts based upon hearsay or Sixth Amendment right of confrontation. However, immediately following the introduction into evidence of these items, Burchfield's counsel made the following statement, out of the hearing of the jury:

> With regards to the introduction of these boxes, obviously in chambers prior to trial we discussed several issues and also it was discussed how I felt that they had to prove this with a toxicologist. Likewise, that is also an objection; and this is not relevant or admissible until they have valid, scientific proof through toxicology.

¶22. Thereafter, Officer Bradley opened one of the packages of pills and read from the back of the box the active ingredient, pseudoephedrine.

¶23. We now face the question of whether the State did enough to prove the pills contained pseudoephedrine. There is a serious question before us of whether Burchfield waived any objection to hearsay or right of confrontation, by allowing testimony and exhibits into evidence, without objection.

8

However, we need not decide this case on that basis, since we find the evidence was admissible, even if objections had been properly preserved.

¶24. In its review of this issue, the Court of Appeals discussed three cases: ***Barnette v. State***, 481 So. 2d 788 (Miss. 1985), ***Kettle v. State***, 641 So. 2d 746 (Miss. 1994), and ***Crisp v. Town of Hatley***, 796 So. 2d 233 (Miss. 2001), and held that they set parameters for proving the chemical composition of evidence. While helpful, however, these cases are not on point. ***Barnette*** and ***Kettle*** involved the sale of cocaine, an illegal drug. ***Crisp*** involved marijuana, an illegal drug. In all three cases, a chemical analysis was performed by the crime lab, an agency of the State, and the issue on appeal involved the attempts to offer the results of the analysis into evidence. In each of the three cases, the person who actually performed the analysis was unavailable at trial for cross-examination.

¶25. By contrast, the case before us today involves legal pills which were legally manufactured for sale, prepackaged with labels disclosing the ingredients, and shipped to drug stores. Thus, the question before us is not whether an employee of the crime lab properly analyzed a chemical in preparation for litigation, but rather whether the label of ingredients is sufficiently trustworthy for admission into evidence. Thus, a different analysis by this Court is required, addressing hearsay, authentication and Burchfield's constitutional right of confrontation.

*Hearsay*

¶26. The State's only evidence that Burchfield had pseudoephedrine was the printed statement of ingredients on the label. Since the printed statement of ingredients on the label unquestionably constitutes an out-of-court statement, offered to prove the truth of the matter asserted (that is, that the pills contained Pseudoephedrine), it is hearsay. *See* M.R.E. 801(c). Burchfield claims that admission of this evidence

9

to prove the pills contained pseudoephedrine violated the rule against hearsay and constituted reversible error.

¶27.  In a rare display of brevity, Rule 802 of the Mississippi Rules of Evidence states, in its entirety: "Hearsay is not admissible, except as provided by law." The reason for the rule is that hearsay is generally considered to be unreliable and untrustworthy. *See **Hercules, Inc. v. Walters***, 434 So. 2d 723, 726-27 (Miss. 1983)  However, because some hearsay is reliable and trustworthy, the rule against hearsay has exceptions. ***Id.***  Rules 803 and 804 list twenty-eight specific categories of statements which are not excluded because they are hearsay.

¶28.  Rule 803 provides, as an exception to the rule against hearsay, "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." M.R.E. 803(17).

¶29.  Since the labels unquestionably constitute a "list" of the ingredients in the  medication, the question we must address is whether the information on the labels is "generally used and relied upon by the public" and thus, qualifies as an exception within the purview of M.R.E. 803(17).  If so, then the evidence will not be excluded on the basis that it qualifies as hearsay.

¶30.  We cannot imagine any hearsay evidence more trustworthy and relied upon by the public than the ingredients label on an unopened box of medication purchased from a drug store.   The Food and Drug Administration regulates over-the-counter medications.   Failure to properly list the ingredients places the pharmaceutical manufacturer in peril.

¶31.  The State of Iowa has a rule of evidence identical to M.R.E. 803(17). The Supreme Court of Iowa recently faced and analyzed a similar case in ***State v. Heuser***, 661 N.W.2d 157 (Iowa 2003), in which "the State offered into evidence the labels from the boxes of cold medication and the batteries found in [the

defendant's] van. The cold medication labels said the medication contained 'pseudoephedrine hydrochloride.'" *Id*. at 162. Regarding the labels from the boxes of cold medication, the court held:

> The applicable . . . federal regulations suggest the cold medication labels are accurate and trustworthy. Additionally, the contemporary nature of pharmaceutical practice exemplifies the inherent trustworthiness of the cold medication labels.
>
> In this modern day, thousands of pharmaceuticals are compounded, processed, and produced, and then packaged and labeled for distribution in that package for direct sale to a customer unopened, and frequently under seal, and as the modern advertising puts it 'untouched by human hands." This is no longer an age when the processor puts the ingredients into a vial with an "eyedropper," with highly variable results appearing in the finished "preparation," but an era characterized by automatic mixing, measuring, and filling apparatus, the entire productive process being controlled by electronic and nucleonic gauges, measuring to infinitesimal precision, to produce an absolute result in meeting a required standard. This is the process that brings to a pharmacist an "exempt" preparation, properly labeled as required by statute, and in this case a label . . specifically designed to make that preparation more quickly identifiable. *State v. Mitchell*, 18 Ohio App.2d 1, 246 N.E.2d 586, 589 (1969). For all these reasons, over-the-counter drug labels are generally used and relied upon as accurate.
>
> The labels in question were required on the cold medication boxes as provided by . . . federal law. [The defendant] possessed the boxes of cold medication that were in the original packages. Both the boxes and the blister packs were unopened. The fact the pills were in the original, unbroken packages indicates the contents had not been changed since the manufacturer packaged them. The cold medication clearly listed pseudoephedrine hydrochloride as one of the active ingredients in each pill. Although the loose blister packs were no in the original boxes, the pack clearly indicated each pack contained Perrigo brand nasal decongestant, containing pseudoephedrine hydrochloride. The labels qualify as a "market list" that is generally used and relied upon by the public. The list comes within the purview of the market reports, commercial publications exception to the hearsay rule.

661 N.W.2d at 164.

¶32. We find the Iowa Supreme Court's "market list" analysis persuasive. Virtually everyone in society, from time to time, will select a box of pills from the shelf at a drug store based solely on the trustworthiness of the printed box. We trust that a box which says "Sudafed," is truly "Sudafed" – not "Benadryl." And we place the pills in our bodies, trusting that they contain the ingredients the labels claim. Therefore, this

11

Court finds that these labels are relied upon by the public and falls within the "market list" hearsay exception.

¶33.    Thus, we find the disclosure of ingredients on the labels of pre-packaged, unopened, over-the-counter medications may be admissible hearsay under M.R.E. 803(17), provided the trial court determines (as he did in this case) that the circumstances warrant admission. That is not to say that every label is admissible. The trial court will still evaluate the circumstances and, where reasonable suspicions are raised, such labels may be properly excluded. These matters are properly within the sound discretion of our learned trial judges.

*Authentication*

¶34.    The Court of Appeals addressed authentication with respect to the labels used at trial in this case:

> Even with an applicable exception to hearsay, the label must be properly authenticated. The central rule is that authentication "as condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." M.R.E. 901(a). The Rule then provides specific examples of means of authentication, but these are for "illustration only, and not by way of limitation . . . ." M.R.E. 901(b). Among the items subject to self-authentication are "labels purporting to have been affixed in the course of business and indicating ownership, control or origin." M.R.E. 902(7). We accept that this rule specifically only permits self-authentication of a label in order to demonstrate the source of a product. This limit is reinforced by the comment to the rule, which cites a precedent in which that was the issue. M.R.E. 902(7) cmt., citing ***Curtiss Candy Co. v. Johnson***, 163 Miss. 426, 141 So. 762 (1932).

> As with the use of Rule 803(24) as the hearsay exception, we conclude that a common sense reading of the authentication requirements is that labels on products of established manufacturers who are engaging in nationwide distribution and are subject to federal regulation, are self-authenticating. The chain of custody of the bottles is not questioned. There is no reason to suspect that the label is not what it purports to be, and no reason to believe that it was affixed by someone other than the stated manufacturer. The labels were self-authenticating.

2004 WL 1244746, *5. We need say no more than this excellent discussion provide by the Court of Appeals.

*Sixth Amendment right of confrontation*

¶35.    Burchfield's belated objection to the use of the labels also included his demand to confront witnesses against him, as guaranteed by the Sixth Amendment to the United States Constitution. This is a matter of first impression in Mississippi. However, other states have faced the question.

¶36.    In *Heuser*, the defendant objected to the use of the labels, claiming they were hearsay, and they violated his right to confront witnesses against him. *Heuser*, 661 N.W.2d at 160-61. The Iowa court stated

> The Confrontation Clause of the United States Constitution permits hearsay evidence to be admitted against the defendant only where the evidence falls within a recognized hearsay exception or particularized guarantees of trustworthiness assure the reliability of the evidence. *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). These exceptions exist to accommodate "situations where it is impossible or impractical to present an actual witness, yet the proffered necessary evidence is inherently trustworthy under the circumstances." 5 John Henry Wigmore, *Evidence* §§ 1420, at 251 (rev. ed.1974).

661 N.W. 2d at 163.

¶37.    In evaluating the case before it, the Iowa Supreme Court evaluated cases from other jurisdictions, then stated:

> More recently, the Appellate Court of Illinois addressed the very issue we have before us. See *People v. Shevock,* 335 Ill.App.3d 1031, 270 Ill.Dec. 390, 782 N.E.2d 949 (2003). The court held the labels from Sudafed packages were admissible as an exception to the hearsay rule. *Id*. at 953-54. The court stated the label was required, subject to penalty, under state and federal law. *Id*. at 954. The court noted violations of the Illinois Food, Drug and Cosmetic Act would result in criminal punishment and destruction of the product. *Id*. Given the fact the Sudafed had been purchased by the defendant, it was in his possession, and the contents were in the original package, the opportunity for tampering or adulteration of the product was reduced. *Id*. (citing *In re T.D.,* 115 Ill.App.3d 872, 71 Ill.Dec. 20, 450 N.E.2d 455, 459 (1983)). These combined circumstances made the label admissible in spite of the hearsay rule. *Id*.

661 N.W. 2d at 163.

13

¶38.    The Appellate Court of Illinois, Fourth District, faced and analyzed a similar case in ***People v.***

***Shevock***, 782 N.E.2d 949 (Ill. App. Ct. 2003), in which it held

> The confrontation clause of the United States and Illinois Constitutions (U.S. Const., amend. VI; Ill. Const.1970, art. I, §§ 8) permits hearsay evidence to be admitted against defendant only where the evidence falls within a firmly rooted hearsay exception or particularized guarantees of trustworthiness assure the reliability of the evidence. ***People v. McClanahan,*** 191 Ill.2d 127, 132, 246 Ill.Dec. 97, 729 N.E.2d 470, 474 (2000), citing *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980).

> The issue of whether a label on a box of over-the-counter medicine listing active ingredients comes within an exception to the rule against hearsay is a matter of first impression. In support of its argument the label was admissible as evidence, the State has cited an analogous case dealing with the admissibility of the label on a glue container to prove it contained a chemical that is a hazardous substance. In *In re T.D.,* 115 Ill.App.3d 872, 71 Ill.Dec. 20, 450 N.E.2d 455 (1983), the court found the container did not fit the business records exception to the hearsay rule because no one identified the label, nor was there testimony it was produced in the routine course of business. *T.D.,* 115 Ill.App.3d at 876, 450 N.E.2d at 457-58. However, the Second District did find the label was properly admissible because it was sufficiently reliable and trustworthy to be considered a hearsay exception. *T.D.,* 115 Ill.App.3d at 876, 71 Ill.Dec. 20, 450 N.E.2d at 458. The label in question was required on the glue container under both state and federal law, subject to penalty, because the chemical in question was a hazardous substance. Therefore, the court concluded its trustworthiness was above suspicion and should be an exception to the rule against hearsay. *T.D.,* 115 Ill.App.3d at 876-77, 71 Ill.Dec. 20, 450 N.E.2d at 458. The circumstances of the case, where the product had been purchased by the defendant and was in its original package, reducing the opportunity for tampering or adulteration, together with the statutory requirement that the product be labeled, combined to make the label admissible in spite of the hearsay rule. *T.D.,* 115 Ill.App.3d at 878, 71 Ill.Dec. 20, 450 N.E.2d at 459.

782 N.E.2d at 953-54.

¶39.    We find the reasoning of the Iowa and Illinois courts to be persuasive. The critical question is one

of trustworthiness and reliability. As stated, the ingredients listed on labels of unopened, over-the-counter

medications are, as a general proposition, sufficiently reliable to overcome the hearsay and Sixth

14

Amendment objections in this case. The use of the labels to prove possession of pseudoephedrine was proper. Thus, this assignment of error has no merit.

¶40.    Both *Heuser* and *Shevock* cite as authority *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980) which has recently been overruled by *Crawford v. Washington*, 541 U.S.__,124 S.Ct. 1354, 158 L.Ed.2d 177(2004). However, *Crawford* does not overrule *Heuser* or *Shevock*, nor does it overrule the point of law upon which we rest our decision.

¶41.    In *Crawford*, the United States Supreme Court held that "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford*, 124 S.Ct. at 1359. The Supreme Court pointed out that *Ohio v. Roberts* held "that an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability -- *i.e.*, falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' [*Roberts*], 448 U.S. at 66, 100 S.Ct. 2531." 124 S.Ct. at 1359. The Court stated that the Confrontation Clause "applies to 'witnesses' against the accused", *id*. at 1364, and further stated that the principle behind the Clause was that "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id*. at 1369. The Court concluded that *Roberts* departed from that principle. *Id.*

¶42. The United States Supreme Court concluded:

> Where non-testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

*Id.* at 1374. Thus, the issue to be addressed is whether the label constitutes "testimonial" or "non-testimonial" hearsay.

¶43. It seems clear to us that the author of the label on the non-prescription, over-the-counter medication at issue here, was not a "witness against the accused." Thus, the statements on the labels, though hearsay, would nevertheless fall within *Crawford*'s discussion of non-testimonial hearsay.

¶44. As such, this non-testimonial hearsay is exempt from the Confrontation Clause challenges, and under the facts and circumstances of the case sub judice, falls within the hearsay exception of M.R.E. 803(17).

### 4. Maximum sentence

¶45. Finally, Burchfield claims the trial court erred in imposing the maximum sentence of five years for conviction of a first offender. The sentence was within the statutory limit and, therefore, is not an abuse of discretion. *Edwards v. State,* 615 So. 2d 590, 597 (Miss. 1993). Additionally, we find the sentence is not grossly disproportionate to the crime.

¶46. The other assignments of error are without merit for the reasons stated by the Court of Appeals.

### CONCLUSION

¶47. For these reasons, we affirm the judgments of the Courts of Appeals and the DeSoto County Circuit Court.

¶48. **CONVICTION OF POSSESSION OF OVER 250 DOSAGE UNITS OF EPHEDRINE AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $1,000.00, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**