#24477-a-JKK

**2009 SD 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

BRAD REAY,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN F. TRANDAHL
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                    and appellee.

TIMOTHY J. RENSCH of
Rensch Law Office                    Attorneys for defendant
Rapid City, South Dakota                    and appellant.

\* \* \* \*

ARGUED OCTOBER 1, 2008

OPINION FILED **02/11/09**

#24477

KONENKAMP, Justice

[¶1.]     Defendant appeals his conviction for the murder of his wife.  We affirm.

## Background

[¶2.]     Defendant, Brad Reay, his wife, Tamara (Tami), and their daughter, Haylee, lived in Pierre, South Dakota.  Defendant was an assistant manager at Wal-Mart.  Tami worked in the shoe department at Kmart.  She met Brian Clark, who also worked at Kmart.  He was married with children.  In December 2005, Tami and Brian began an affair.

[¶3.]     In the first week of February 2006, Tami told defendant she wanted to date other people:  she wanted a divorce.  Defendant wanted to work things out.  He even called Tami's mother, Bonnie Burns, asking that she help convince Tami to salvage the marriage.  Tami would not relent.  She suggested a divorce after Haylee's current school year ended.

[¶4.]     On Tuesday, February 7, 2006, Tami and Brian met at the Fawn Motel.  In the afternoon, Tami went to the Georgia Morse Middle School to watch her daughter play basketball.  Following basketball and fast food, Tami and Haylee went shopping, and then headed home.  Haylee was in bed by 9:00 p.m.  Later, in describing that night, Haylee, age thirteen, would tell a jury that while she was awake in bed, defendant opened her bedroom door:  "He had a bunch of clothes in his arm and I asked him what he was doing. . . .  He just said 'nothing' [a]nd he put the clothes down and then came and laid with me."  He told her he loved her.  She fell quickly back to sleep.  When defendant woke her the next morning, Haylee

noticed that the laundry machines were running. She asked where her mother was, and defendant responded that she was in bed. Tami and defendant had separate bedrooms. Haylee went to her mother's bedroom, but all she found was an unmade bed. Her mother's cell phone was on the dresser. She looked in the garage and found her mother's car there. She discovered her mother's purse in the kitchen. When she told her father that her mother was not in the house, he replied that she had a boyfriend and she might be at his home. As he drove her to school that morning, defendant told Haylee, "Don't tell anybody [about Tami not being home] because it's personal." Haylee recalled that on the Sunday previous to her mother's disappearance, when she first learned from her parents that they were getting a divorce, her father was "acting weird. . . . He wouldn't eat and he'd just sit in his bed and not talk or anything."

[¶5.] Tami commonly telephoned her mother, Bonnie, every day. When Bonnie did not receive a call from Tami on Wednesday, February 8, 2006, she called Haylee at her school. Haylee said that the last time she saw her mother was the previous evening. Bonnie then called Brian at Kmart to ask if he had seen Tami. She was scheduled to work at 10:00 a.m., but failed to show up. Brian called the Pierre Police Department and reported Tami missing. He disclosed to Lieutenant Dave Panzer his affair with Tami and expressed his fear that defendant may have done something to her.

[¶6.] Lieutenant Panzer contacted Detective David DeJabet to assist in the missing person investigation. Detective DeJabet sent Detective Troy Swenson to the Georgia Morse Middle School to talk to Haylee. In the meantime, Lieutenant

Panzer and Detective DeJabet went to defendant and Tami's home. Lieutenant Panzer knocked on the front door, but nobody answered. Detective DeJabet went to the back door and looked through a window into the garage. He saw a parked black Dodge Durango. He also noticed "a reddish brown stain on the door."

[¶7.] With mounting apprehension, Lieutenant Panzer called Patrol Officer Leasa McFarling to watch the house while Detective DeJabet and Lieutenant Panzer met with defendant in the security office at Wal-Mart. The officers explained to defendant that they had concerns that Tami was missing. Defendant told the officers that when he got home the night before, Tami was not there. Defendant said that at 1:00 a.m. he heard a vehicle pull into the driveway. He looked and saw the Durango parked there, without Tami, and another vehicle driving away. Defendant said he pursued the vehicle in the Durango, but without success.

[¶8.] Lieutenant Panzer and Detective DeJabet then asked if defendant would meet them at defendant's home to see if Tami had returned. Defendant agreed and accepted a ride with the officers. Officer McFarling was still at the home when Lieutenant Panzer, Detective DeJabet, and defendant arrived. Detective Troy Swenson showed up shortly thereafter. Lieutenant Panzer asked defendant for written consent to search his home and vehicles. He consented, and Detectives Swenson and DeJabet and Lieutenant Panzer entered the residence together. Defendant waited outside. During the search, the officers saw what appeared to be a blood droplet on the garage floor. They also smelled a strong odor of cleaning solution coming from the Dodge Durango. Detective DeJabet suspected

homicide. He directed the officers to stop the search while a search warrant was obtained.

[¶9.] Defendant was taken to the police station, where he was interviewed by Detective Swenson, Lieutenant DeJabet, and Division of Criminal Investigation Agent Guy DiBenedetto. The interview lasted five hours. Defendant repeatedly denied doing anything to Tami and denied knowing anything concerning her whereabouts.

[¶10.] As defendant was being interviewed, Special Agent Michael Braley, a crime scene investigator, along with other law enforcement officers, executed a search warrant on defendant's home and vehicles. The search revealed that the Dodge Durango had been freshly cleaned and that there was fresh laundry on defendant's bed and in the washer and dryer. Swabbed samples were taken from the blood spot on the garage floor, the washer, certain walls, a light switch, trim, a bed, and Tami's dresser. After defendant's interview, he was arrested for first degree murder and taken to the Hughes County Jail.

[¶11.] Two days later, a pilot flying a National Guard helicopter spotted a body by the emergency spillway at Oahe Dam. It was Tami. Her body, nude, throat slashed, had been stabbed over thirty times. A knife-riddled t-shirt and bloody gloves were nearby. She was taken to Rapid City for an autopsy, where a pathologist, Dr. Donald Habbe, obtained her fingernail scrapings, DNA samples, rectal and vaginal swabs, and blood samples.

[¶12.] While defendant was in custody awaiting trial, he carried on various conversations and correspondence with his twin brother, Bret. These were

monitored by the Hughes County Jail. Bill Dodge, the administrator at the jail, released the recorded conversations and photocopied correspondence to Agent DiBenedetto and Hughes County Sheriff, Mike Leidholt. In one such correspondence was a map drawn by defendant, purporting to tell Bret where the good fishing spots were around Oahe Dam. Using this map and other information gathered during defendant's conversations with Bret, Agent Braley and the Watertown Search and Rescue Team, aided by a bloodhound and cadaver dog, uncovered three City of Pierre garbage bags containing bloody linens, rubber gloves, bloody blankets, panties, a bloody tarp, and a box of condoms with one missing. The garbage bags were hidden in a row of juniper hedges, vegetation similar to what law enforcement officers collected from the bottom of defendant's shoes. Also, the garbage bags were the same type as those found in defendant's garage.

[¶13.] During another monitored exchange between defendant and his brother, defendant had Bret hand copy a letter defendant had written. After copying the letter to a notebook, Bret left the jail. Later that day he was apprehended in Spearfish, South Dakota, and a warrant was issued to search his car. His notebook was confiscated. Bret told the officers that he had copied a letter from defendant and sent it to four people as directed by defendant.[1] The following day, the Attorney General's office received four anonymous letters, supposedly written by a cousin of Tami's killer, disclosing an unknown detail: Tami was "raped, lost rubber in ass." After seeing these letters, Agent DiBenedetto asked the

---

1.     Bret was indicted on four counts of accessory to murder. He pleaded guilty to two counts and was awaiting sentencing at the time of defendant's trial.

pathologist, Dr. Habbe, to re-examine Tami's body, which was still in the morgue in Rapid City. The examination revealed that a condom was in fact in her rectum.

[¶14.]     Defendant was indicted for first degree murder or in the alternative first degree manslaughter. The jury trial lasted two and a half weeks. During the trial, defendant objected to the admission of numerous pieces of evidence, ranging from knives, clothing, tarps, letters, documents, allegedly bloody bed sheets, and swabs of spots purportedly containing blood. Defendant argued that the State failed to establish a sufficient chain of custody because it did not offer testimony from the custodian at the State Crime Lab responsible for the care and custody of the evidence. According to defendant, the State's chain of custody evidence did not prove that the evidence remained in an unaltered state. The court, however, concluded that a sufficient chain of custody was established and admitted the evidence.

[¶15.]     Defendant also objected when the State attempted to argue that, although it never compared Haylee's DNA to the DNA collected, it could exclude the presence of Haylee's DNA because the State knew the DNA profiles of her parents. According to defendant, the opinion that the presence of a child's DNA could be excluded based on the parents' DNA profiles was an opinion not disclosed before trial. This testimony, defendant argued, justified a mistrial because it violated the court's discovery order that required the State to disclose the opinions of its testifying experts before trial. The court allowed the testimony and denied defendant's mistrial motion.

[¶16.]     Tami's mother, Bonnie, testified at trial. When she was cross-examined by the defense, she was asked about her statement to a social worker that Haylee was normally an emotional child, but on the day of Tami's murder she was particularly calm. In response, the State asked Bonnie on re-direct examination whether Bonnie had a similar situation take place in her family that allowed her to see people's reactions to a tragedy. Defendant objected on the ground that the testimony was irrelevant and prejudicial. The court overruled his objection and allowed the testimony. Also overruled was defendant's hearsay objection when the State offered a box of Vivarin into evidence and had defendant read aloud the warning label on the box.

[¶17.]     In his defense, defendant maintained that his daughter Haylee killed her mother. He concealed the homicide for Haylee, he said, because he "didn't want her to get in trouble." He testified that on the night Tami was killed, he found Haylee standing by Tami's dead body holding a knife. Haylee said nothing when defendant asked her, "Haylee, what have you done." According to defendant, Haylee had blood on her face and hands, and was bleeding from the nostrils. He described Haylee as "Catatonic or in shock. I can't really say." He told the jury that to conceal what Haylee had done, he washed the blood from her, cleaned the scene, planted a condom in Tami's rectum, hid evidence, dumped Tami's body by the Missouri River, lied to law enforcement officers during their investigation, and tried to direct suspicion toward Brian Clark.

[¶18.]     In support of his defense that Haylee killed her mother, defendant proposed the following jury instruction: "Any person who committed the act

charged without being conscious thereof is incapable of committing such crime." He requested this instruction based on his theory that when Haylee stabbed her mother she was not conscious, and thus, could not be held legally responsible. Defendant asserted that the proposed instruction would diminish the impact of his accusation against his daughter and allow him to argue that he was guilty of some lesser crime than murder. The court rejected the proposed instruction on the grounds that it was not relevant to defendant's guilt or innocence, would generate speculation and conjecture, and was inappropriate because Haylee was not on trial.

[¶19.] The jury found defendant guilty of first degree murder and the court imposed the mandatory sentence of life in prison without the possibility of parole. On appeal, defendant asserts that the trial court erred when it (1) determined that a proper chain of custody had been established for various pieces of evidence; (2) allowed Bonnie to testify that she had previously gone through a similar experience in her family; (3) failed to give his theory of the defense instruction; (4) denied his mistrial motion for violation of the discovery order; and (5) admitted the box of Vivarin over his hearsay objection.

## Analysis and Decision

### 1. Chain of Custody

[¶20.] During the trial, the court admitted numerous pieces of evidence over defendant's objection that the State failed to establish a sufficient chain of custody to show that the evidence had not been altered, tampered with, or changed. It is undisputed that the State did not offer the testimony of the evidence custodian, the only person with personal knowledge about what happened with the evidence after

it was placed in the State Crime Lab.  The State did offer, however, the testimony of the person who collected or created the evidence, and, when necessary, the analyst at the State Crime Lab who tested it.

[¶21.]        Defendant contends that a proper chain of custody was not established for the buccal swab of Brian Clark; the DNA swab of defendant; Tami's blood sample; hairs from defendant; the outside and inside of a right-hand glove; the inside and outside of a t-shirt; swabs of the exterior of the home garage door, garage floor, bedroom wall, downstairs bedroom dresser, the passenger side rear wheel well of the Dodge Durango, the front middle seat center cushion of the Durango, and the steering wheel column of the Durango; the plants and fibers from the back of a t-shirt; and the vaginal and rectal swabs and the hairs from Tami's body.

[¶22.]        Trial courts have broad discretion in determining "the competency of chain of custody evidence."  State v. Lownes, 499 NW2d 896, 901 (SD 1993) (citing State v. Wimberly, 467 NW2d 499 (SD 1991); State v. Miller, 429 NW2d 26 (SD 1988)).  "In considering the admissibility of demonstrative evidence, the trial judge must be satisfied in reasonable probability that the object sought to be admitted is the one involved in the case, and that it has not changed in important respects."  State v. Serl, 269 NW2d 785, 788 (SD 1978) (citing State v. Christmas, 83 SD 506, 162 NW2d 125 (1968)).  We review a court's chain of custody decision under the abuse of discretion standard.  Lownes, 499 NW2d at 901.

[¶23.]     To be sure, the State makes no claim that a *complete* chain was presented for each piece of evidence. [2]  It maintains, however, that a *sufficient* chain of custody was established to allow the court to conclude with reasonable probability that no tampering or substitution occurred.  The State further argues that absent evidence from defendant of tampering or substitution, mere speculation is insufficient to defeat admission of the evidence.

[¶24.]     Defendant, in contrast, insists that the burden is on the State "from the outset" to establish a proper chain of custody and that such "is more than a mere formality."  According to defendant, when he made an appropriate objection, the court should not have admitted this evidence, which is indistinguishable, not readily identifiable, and easily susceptible to alteration, substitution, tampering, or contamination, without authenticating testimony from the evidence custodian.  The custodian, the defendant avers, is the only person that could "tie the gap" in the chain of custody.

[¶25.]     "The 'chain of custody' rule, requiring the prosecution to account for the whereabouts of physical evidence connected with a crime from the time of its

---

2.     The State concedes that with respect to two pieces of evidence challenged by defendant, the chain of custody is "not as complete."  Nonetheless, the State insists that "the totality of the testimony from all witnesses, including the markings present on the exhibits, created a sufficient chain of custody for these items as well."  Criminalist Kandy Smith testified about the vaginal and rectal swabs of Tami.  She stated that she examined the swabs, but the State did not ask her whether the swabs appeared to be in the same condition as when she tested them.  Then, with respect to the hair samples from defendant, Agent DiBenedetto testified about the collection of the hairs and said that they appeared to be in the same condition as when he submitted them for testing.  No lab personnel, however, testified regarding the testing or examination of these hairs.

seizure to its offer at trial is to [e]nsure that the real evidence offered is that object which was involved in the transaction, and that the object is in a substantially unchanged condition." *Serl*, 269 NW2d at 789. It is not necessary for the State to establish an "absolutely perfect chain of custody," but the testimony "must at least 'strongly suggest[ ] the exact whereabouts of the exhibit at all times[.]'" *Id.* (quoting State v. Lunsford, 204 NW2d 613 (Iowa 1973); Butler v. State, 289 NE2d 772, 777 (IndCtApp 1972)).

[¶26.] There is nothing to suggest that the challenged evidence was tampered with or altered. Defense counsel insists, nonetheless, that because the evidence custodian did not testify defendant was deprived of his right to "inquire about the chain of custody or the possibility of tampering." "'Mere suspicion or speculation is insufficient to establish a break in the chain of custody.'" Kurtz v. Squires, 2008 SD 101, ¶11, 757 NW2d 407, 413 (quoting *Lownes*, 499 NW2d at 901). A court need only conclude "in reasonable probability that the object sought to be admitted is the one involved in the case, and that it has not changed in important respects." *Serl*, 269 NW2d at 788 (citing *Christmas*, 83 SD at 510, 162 NW2d at 127).

[¶27.] We are puzzled by the State's decision not to offer the testimony of the evidence custodian for evidence that was fungible and not readily identifiable. This evidence was heavily relied on by the State in establishing defendant's guilt. When asked during oral argument, the State could not explain why the custodian was not called to testify. The trial was held in Pierre, the same city where the evidence was kept. Nonetheless, it is well settled that an absolutely perfect chain of custody is not required. *Kurtz,* 2008 SD 101, ¶11, 757 NW2d at 412. The fact that one of the

people in control of the evidence did "'not testify at trial does not, without more, make the substance or testimony relating to it inadmissible.'" Stringer v. State, 647 SE2d 310, 314 (GaCtApp 2007) (quoting Hayes v. State, 623 SE2d 144, 146 (GaCtApp 2005) (quoting Palmer v. State, 297 SE2d 22 (Ga 1982))). The State "need not call as authenticating witnesses each person who handled the object from the time of its recovery to the time of trial, so long as enough testimony is presented to permit a reasonable inference that the object offered is what the proponent claims it to be." Pool v. State, 17 P3d 1285, 1290 (Wyo 2001) (quoting Robinson v. State, 716 P2d 364, 369 (Wyo 1986) (quoting 3 D. Louisell & C. Mueller, Federal Evidence §515 at 88-89 (1979))).

[¶28.]     Considering the entire record, we cannot conclude that the court abused its discretion when it ruled that a sufficient chain of custody had been established to admit the evidence. Yet, even if the court had abused its discretion, defendant alleges no specific prejudice suffered as a result. He has not claimed that the evidence was altered, changed, or substituted. Nor does he dispute the veracity of the challenged evidence, as he testified that he cleaned the blood in the house and Durango, wrapped Tami's body in the tarp, disposed of her near the river, and placed the condom in her rectum. In consequence, some of this evidence only reinforces his testimony and the theory of his defense.

### 2. Testimony from Tami's Mother

[¶29.]     Tami's mother, Bonnie, testified for the State on a number of things, including the conversations she had with Haylee the day Tami went missing. On cross examination, defendant asked Bonnie about a statement she made to the

Department of Social Services that she was surprised by how calm Haylee was the day Tami went missing because Haylee was normally a very emotional child. On re-direct examination, the State asked Bonnie about her experience with a similar situation in her family that allowed her to see people's reactions. Defendant objected, claiming that Bonnie's testimony about a previous tragedy was irrelevant, only worked to evoke sympathy from the jury, and was unfairly prejudicial.

[¶30.]    The court allowed the following testimony:

> **State's counsel, Mr. Love:** Is this the first time in your life that you have had the opportunity to see somebody go through this experience?
> **Bonnie:** No.
> **Defense counsel, Mr. Rensch:** Objection. Relevance, Your Honor.
> **The court:** Overruled. You may answer.
> **Mr. Love:** How have you seen this before?
> **Mr. Rensch:** Objection. Relevance.
> **The court:** Counsel approach. (A bench conference was held but not reported.)
> **The court:** You may continue, Mr. Love.
> **Mr. Rensch:** For the record, my objection also included [Rule] 403.
> **The court:** Thank you. I've done the balancing test and I do not find it unfairly prejudicial. You may answer. Do you recall the question?
> **Bonnie:** Could you repeat that?
> **Mr. Love:** You've described Haylee's reactions and your sense of Haylee's reactions to this situation. Have you had the opportunity to see this situation before?
> **Bonnie:** Yes.
> **Mr. Love:** And persons' reactions to that situation?
> **Bonnie:** You're asking me how I –
> **Mr. Love:** Have you had a chance to see other people's reactions to a similar situation in the past?
> **Bonnie:** Yes.
> **Mr. Love:** Was that an event that took place within your family?
> **Bonnie:** Yes.
> **Mr. Rensch:** Same objection, Your Honor.
> **The court:** So noted. Overruled. The answer will stand.

Defendant argues that the trial court abused its discretion when it allowed Bonnie to testify about a previous tragedy in her family, on the grounds that the testimony was "explosive," tainted juror perceptions, and was persuasion by illegitimate means. Defendant claims that the great weight of this prejudicial testimony necessitates a new trial.

[¶31.] A court "has wide discretion in determining the prejudicial effect of a witness' statements[.]" State v. Michalek, 407 NW2d 815, 818 (SD 1987) (citing State v. Farley, 290 NW2d 491, 494 (SD 1980)). Thus, we review a court's decision to admit such testimony under the abuse of discretion standard. State v. Lassiter, 2005 SD 8, ¶13, 692 NW2d 171, 175 (citing State v. Red Star, 2001 SD 54, ¶10, 625 NW2d 573, 576-77). However, "[t]o obtain a new trial, a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." Id. (citing Red Star, 2001 SD 54, ¶10, 625 NW2d at 577 (citing SDCL 15-6-61)). "'Prejudicial error' is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." Michalek, 407 NW2d at 818-819 (citing State v. Dokken, 385 NW2d 493, 498 (SD 1986); State v. Reddington, 80 SD 390, 396, 125 NW2d 58, 62 (1964)).

[¶32.] The State contends that Bonnie's testimony was properly allowed. It argues that defendant opened the door to this line of questioning by "squarely" placing "Haylee's reaction to Tami's death," and Bonnie's "ability to judge that reaction before the jury." While Bonnie's ability to judge *Haylee's* emotions and temperament might be relevant, Bonnie's ability to gauge *other people's* reactions to

a previous family tragedy is not. There is no link to Bonnie's previous family tragedy and Haylee. The court abused its discretion when it allowed this testimony. However, the statements ultimately made by Bonnie cannot be said to have "produced some effect on the jury's verdict[.]" *See id.* (citations omitted). Bonnie never testified to the specifics of the tragedy suffered by her family. And, the State made no further effort to exploit the facts surrounding Bonnie's previous experience.

### 3. Theory of the Defense Instruction

[¶33.] Defendant next asserts that the court erred when it refused to instruct the jury that "[a]ny person who committed the act charged without being conscious thereof is incapable of committing such a crime." Defendant makes no claim that he acted unconsciously. Rather, he contends that his daughter killed Tami in what he portrays as a catatonic state. As defense counsel told the court during the settlement of jury instructions, "the jury may be thinking that [defendant] is simply trying to get his daughter in trouble to save himself." Defendant argues that if the jury knew Haylee could not be found guilty, he could have lessened the negative impact of his claim that his daughter murdered her mother.

[¶34.] Undoubtedly, "[a]n accused must 'be afforded a meaningful opportunity to present a complete defense.'" State v. Packed, 2007 SD 75, ¶27, 736 NW2d 851, 860 (quoting State v. Iron Necklace, 430 NW2d 66, 75 (SD 1988)). "When a defendant's theory 'is supported by law and . . . has some foundation in the evidence, however, tenuous[,]' the defendant has a right to present it." *Id.* ¶25 (quoting United States v. Grimes, 413 F2d 1376, 1378 (7thCir 1969) (citing Tatum

v. United States, 190 F2d 612, 617 (DCCir 1951); United States v. Phillips, 217 F2d 435, 442-43 (7thCir 1955)) (additional citations omitted)). We review "the refusal of proposed jury instructions under the abuse of discretion standard." State v. Jensen, 2007 SD 76, ¶7, 737 NW2d 285, 288 (citation omitted).

[¶35.] In this case, defendant was not denied a right to present a complete defense. His contention was that he did not kill Tami, but his daughter did. In support of his position, he was in no way restricted in offering evidence and argument of third-party culpability. *See Packed*, 2007 SD 75, ¶¶22, 23, 736 NW2d at 858-59. The jury was properly instructed that the prosecution must prove defendant's guilt beyond a reasonable doubt. Moreover, the subject of defendant's motive was also properly instructed with the pattern instruction.

[¶36.] Defendant insists, however, that because his proposed instruction is a correct statement of law and he testified, in effect, that Haylee acted involuntarily, the instruction should have been allowed. In *State v. Moss*, the defendant argued that the court should have given the jury an instruction on the offense of public indecency. 2008 SD 64, ¶25, 754 NW2d 626, 634. That instruction, Moss claimed, would have allowed him to argue that the State could have charged him under a lesser criminal statute. In considering this argument, we recognized that defendants are entitled to an instruction for every issue of fact raised material to their defense. Nevertheless, because the lesser-crime instruction was not a lesser-included offense of the crime charged against Moss, we held that there was no error in excluding it. *Id.* ¶26. The uncharged crime was not material to his defense of the charged crime. *Id.* ¶27.

[¶37.] Here, the requested instruction was not germane to the question the jury had to decide: whether defendant killed Tami. Indeed, such an instruction would not have been exculpatory for defendant. His proposed instruction related not to his defense, but to a defense his daughter might have had if she were charged. But, as the trial court found, instructing the jury on whether Haylee might have been mentally culpable had she been charged with murder would have been speculative and confusing. Even if Haylee had been the killer, the jury did not need to decide the legal effect of her consciousness to find defendant not guilty. Defendant cites no authority where such an instruction was given in similar circumstances. Because the proposed instruction was extraneous to his defense that he did not kill Tami, the court did not abuse its discretion in refusing defendant's requested instruction.

### 4. Discovery Violation

[¶38.] Before trial, the State was ordered to identify any experts and provide "a complete listing, designation, summary, and identification of each and every expert opinion" intended to be offered during trial. According to defendant, the State violated this discovery order when it offered certain expert testimony from Kandy Smith, a criminalist at the State Crime Lab. Smith testified that the presence of a child's DNA can be determined based on the known DNA profiles of that child's parents. This testimony was offered even though a DNA sample taken from Haylee was never tested by the State. Defendant claims that with the previously undisclosed expert opinion the State was able to imply that the presence of Haylee's DNA was excluded based on the known profiles of defendant and Tami.

Defendant objected to this testimony and moved for a mistrial. The court overruled defendant's objections and denied a mistrial. It ruled the discovery order was not violated because Smith did not give a specific opinion on whether the presence of *Haylee's* DNA was excluded.

[¶39.] "[O]ur standard of review for the violation of a discovery order mirrors the standard applied when reviewing both mistrial motions and evidentiary issues." State v. Krebs, 2006 SD 43, ¶19, 714 NW2d 91, 99.

> We review evidentiary decisions deferentially, reversing only when the court has abused its discretion. State v. Sieler, 397 NW2d 89, 91 (SD 1986) (string citation omitted); *see also* State v. Peterson, 1996 SD 140, ¶8, 557 NW2d 389, 391. It does not matter if we would have made a similar ruling; rather, we inquire whether "a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion." *Sieler*, 397 NW2d at 91 (citations omitted).

State v. Dillon, 2001 SD 97, ¶24, 632 NW2d 37, 47. If "a discovery order is violated, the inquiry is whether the defendant suffered any material prejudice as a result of the late disclosure." *Krebs,* 2006 SD 43, ¶19, 714 NW2d at 98 (citing State v. Archambeau, 333 NW2d 807, 810-11 (SD 1983)). Material prejudice is established "'when in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it.'" *Id.* (quoting State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544).

[¶40.] Smith's testimony began with a general description of DNA testing. She explained how such testing is used to exclude or include individuals as contributors to the tested DNA sample by using known and unknown DNA samples. After providing background information on DNA testing, Smith testified about her involvement in this case. She identified the evidence she collected and explained

the testing she performed. She also identified the DNA contributors to the evidence.

[¶41.] During her testimony about a washcloth that defendant claimed to have been used to wipe Haylee's blood, Smith stated that there was a mixture of DNA present. She explained that Tami's DNA was identified as a contributor, and that defendant's DNA could not be excluded, but also could not be specifically included. The State then asked Smith if she had tested Haylee's DNA. She answered that she had not. Next, the State asked whether Smith could exclude the presence of Haylee's DNA based on the known profiles of Tami and defendant. Defense counsel objected, and after a bench conference, the court sustained the objection.

[¶42.] Through the remainder of Smith's testimony, her opinion regarding the scientific practice of excluding or including the presence of a child's DNA based on the parents' known profiles became the focus. During re-direct examination, the following exchange took place:

> **Q:** Now you testified or in response to one of Mr. Rensch's questions, you indicated that taking a buccal swab . . . from Haylee Reay and developing a DNA profile is one way to make a comparison to an unknown DNA sample, correct?
> **A:** Yes, sir.
> **Q:** Is there another way to do it?
> **A:** By knowing her biological parents' types you can have a rough estimate of what the potential types are at each particular location.
> **Q:** And based upon that analysis, if you were to examine the DNA profiles that you obtained from unknown samples, would there be occasions when you'd be able to include or exclude Haylee Reay as a contributor of those samples?
> **A:** Yes, sir.

Defense counsel, on re-cross examination, asked Smith, "Did you exclude Haylee Reay from any item you examined?" Smith responded, "I did not put into any of my reports statements about Haylee Reay." On further re-direct examination, the State asked Smith, "Can you exclude Haylee Reay as a contributor of DNA from any of the items that you tested." Smith replied, "Knowing her biological parents' profiles, yes, I could."

[¶43.] The State claims that Smith's testimony was not an expert opinion because she only testified to general principles of DNA testing. Yet, how DNA is tested, what is involved, and how an individual is included or excluded as a contributor is something not known by the general public. Smith's testimony was clearly offered as an expert opinion. In fact, during direct examination the State asked Smith for her opinion on whether "the inclusion or elimination of a child as a contributor of DNA based on comparison to known parents' DNA [is an] accepted scientific practice."

[¶44.] All the same, the State maintains that the discovery order was not violated because defendant opened the door to the evidence and Agent DiBenedetto also testified that the presence of a child's DNA can be determined based on the parents' DNA profiles. While Agent DiBenedetto's testimony was not an expert opinion, he did testify, "You can actually match or show no match of the [DNA] evidence of a child of biological parents without the child's profile." He also testified that based on his "crime investigation knowledge," the presence of a child's DNA can be eliminated when the parents' DNA profiles are known. Defendant did not object.

[¶45.] Even if we assume the court abused its discretion when it held that the State did not violate the discovery order, defendant has not shown material prejudice to his case. Smith never testified explicitly that she did in fact exclude the presence of Haylee's DNA from the evidence based on the DNA profiles of Haylee's parents. She only testified that she "could" exclude it, a somewhat ambiguous response. Moreover, in closing argument the prosecution did not argue that its expert had excluded Haylee's DNA. It conceded that the washcloth DNA was unidentified. Defendant does not claim that Smith's undisclosed opinion was the cause of his prejudice. Rather, he asserts he was prejudiced because of what the State was able to imply by using Smith's testimony. According to defendant, the State was able to mitigate the fact that it chose not to test Haylee's DNA by using Smith's testimony that Haylee's DNA could be excluded because the State knew Tami's and defendant's DNA profiles.

[¶46.] Prejudice, sufficient to require relief, must "in all probability" have "produced some effect upon the final result and affected rights of the party assigning it." *Krebs,* 2006 SD 43, ¶19, 714 NW2d at 99 (quoting *Mattson*, 2005 SD 71, ¶13, 698 NW2d at 544). We cannot say that Smith's opinion in all probability affected the substantial rights of defendant or the final result of his trial. Defendant does not dispute that it is an accepted scientific fact that elimination of a child as a contributor of DNA can be accomplished from the known DNA profiles of the parents. Finally, defendant never requested a continuance to hire his own expert nor objected when Agent DiBenedetto testified to the same opinion.

**5. Admission of Vivarin box.**

[¶47.]     During the State's cross examination of defendant, it offered into evidence a box of Vivarin, an over-the-counter caffeine supplement. The State's request arose in response to defendant's claim that at the time of Tami's death he had been up for several nights and was exhausted. The State asked him whether he used Vivarin before. The State had a photograph of a wrapper from a Vivarin box in defendant's truck. Defendant testified that he had used Vivarin when hunting, but not during the nights in question. The State, using a Vivarin box it had recently purchased at the store, requested that defendant read aloud the warning label on the back. Defendant objected asserting that the warning label was inadmissible hearsay. The court overruled his objection, admitted the evidence, and allowed the State to have defendant read aloud the warning label.

[¶48.]     "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." SDCL 19-16-1(3) (Rule 801). Clearly, the warning label on the Vivarin box is hearsay. It is a statement made by the manufacturers of Vivarin, offered to prove the truth of the producer's warning statement. The State now concedes this. Nevertheless, the State asks this Court to adopt the view that the product packaging, although hearsay, fits within the market reports hearsay exception. *See* SDCL 19-16-21 (Rule 803(17)). See also cases cited by the State. Brand v. State, 941 So2d 318, 320-21 (AlaCrimApp 2006); *In re* Micheal G., 19 CalApp4th 1674, 1677 (CalCtApp 1993); Reemer v. State, 835 NE2d 1005, 1007-08 (Ind 2005); State

v. Heuser, 661 NW2d 157, 162-63 (Iowa 2003); Burchfield v. State, 892 So2d 191, 198 (Miss 2004); Shaffer v. State, 184 SW3d 353, 362 (TexCtApp 2006).

[¶49.]    While other courts have applied the market reports exception to certain product packaging, the hearsay statements in those cases came from evidence found specifically in the defendant's possession. *See Brand*, 941 So2d at 320-21 (introduction of boxes of cold and allergy medicine purchased by defendant); *Micheal G.*, 19 CalApp4th at 1677 (spray can in defendant's possession); *Reemer*, 835 NE2d at 1008 (labeling found from tablets in defendant's possession); *Heuser*, 661 NW2d at 162 (labels and boxes found in defendant's van); *Burchfield*, 892 So2d at 198 (ingredients on label in defendant's possession); *Shaffer*, 184 SW3d at 362 (labels on cold medication in defendant's possession).  Here, the Vivarin box admitted at trial was not the one photographed in defendant's truck.  It was purchased by the State.  Thus, regardless of the trustworthiness of the product's packaging, there was no showing that the product listing or warning label on the package purchased by the State was the same as the label on defendant's box.

[¶50.]    The Vivarin warning label introduced by the State does not fit any hearsay exception, and the court erred in ruling otherwise.  However, the error is harmless as we conclude beyond a reasonable doubt that the jury would have returned a guilty verdict despite the error.  *See* SDCL 23A-44-14 (Rule 52(a)); *see also Michalek*, 407 NW2d at 819 ("The harmless error rule" does not require "the automatic reversal of a conviction, provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained.") (citing State v. Heumiller, 317 NW2d 126, 130 (SD 1982)

(citing Chapman v. California, 386 US 18, 87 SCt 824, 17 LEd2d 705 (1967); Harrington v. California, 395 US 250, 89 SCt 1726, 23 LEd2d 284 (1969))).

[¶51.] Even if we were to assess the asserted errors in this case for cumulative effect, these errors created no cumulative prejudice. *See* State v. Davi, 504 NW2d 844, 857 (SD 1993) (citing McDowell v. Solem, 447 NW2d 646, 651 (SD 1989)).

[¶52.] Affirmed.

[¶53.] GILBERTSON, Chief Justice, MEIERHENRY, Justice, SABERS, Retired Justice and TIMM, Circuit Judge, concur.

[¶54.] TIMM, Circuit Judge, sitting for ZINTER, Justice, disqualified.