RANDOLPH, Justice,
Concurring in Part and Dissenting in Part.
I.
¶ 26. Notwithstanding the deference we accord the Mississippi Commission on Judicial Performance, I am constrained to dissent to the sanctions recommended by the Commission and adopted by the majority. The sanctions are woefully inadequate and nearly naught to the offenses, as opposed to “ought [to] fit the offense.” In re Bailey, 541 So.2d 1036, 1039 (Miss.1989). The sanctions imposed fail to adequately address the multitude of separate offenses and fail to consider collectively the multiple acts of misconduct exhibited by Judge Bradford. Essentially, his overall course of misconduct is treated as one incident, thus allowing him to circumvent some of the Gibson factors. See Miss. Comm’n on Judicial Performance v. Gibson, 883 So.2d 1155, 1158 (Miss.2004). This proceeding resulted from a host of complaints, unlike “first-time offenders” such as Gordon and Sanford. See Miss. Comm’n on Judicial Performance v. Gordon, 955 So.2d 300, 305 (Miss.2007); Miss. Comm’n on Judicial Performance v. Sanford, 941 So.2d 209, 216 (Miss.2006).
¶ 27. The multiple complaints, brought by separate victims of Judge Bradford’s egregious behavior on (and off) the bench, should be individually considered, and then considered in toto, to determine the proper sanctions. Absent such analysis, the sanctions imposed do little to recognize the harm to the public and will only magnify the public’s distrust for the judicial disciplinary process.
A. EX PARTE COMMUNICATIONS
¶ 28. The Joint Memorandum relates the following regarding ex parte communications:
Ms. Ford petitioned the court for possession of rental property and a judgment against Ms. Reynolds in the sum of $1162.00. [Judge Bradford] heard testimony from both sides and then took the case under advisement. After Ms. Reynolds left the courtroom and after court concluded, Ms. Ford went back into the courtroom and engaged in an ex parte conversation with [Judge Bradford]. [Judge Bradford] then issued a judgment in favor of Ms. Ford in the sum of $964.00 and awarded her immediate possession of the premises.
Thus, one litigant went home falsely believing that the court was considering the merits (or lack thereof) of her case, foolishly assuming that the decision would be based on the evidence adduced during the trial. Little did she know that the proceeding continued to a conclusion in her absence. It does not take an attorney or a judge to discern that, not only was her right of equality before the bench violated, but also that her due process rights became meaningless aspirations. Judge Bradford not only removed “Lady Justice’s blindfold,” she was removed from the courtroom. This complaint, standing alone, would mandate the sanctions imposed today.
B. TICKET-FIXING
¶ 29. Not to be satisfied with willful misconduct in “his courtroom,” Judge Bradford sought to influence the administration of justice before other judges. A separate complaint recounts that Judge Bradford intervened in a case not before him by calling the county prosecutor and requesting that traffic citations be dismissed in a case assigned to another judge. *260 A strong argument exists that this misconduct exceeds the more common complaint of fixing tickets, for he chose secretly to influence a case assigned to another judge. Seeking special treatment for a privileged few is a subversion of justice. Such misconduct, standing alone, would, once again, mandate today’s punishment.
¶ 30. The majority notes the Commission’s finding that Judge Bradford’s other dispositive actions were “akin to ‘ticket fixing.’” Most ticket-fixing cases involve incidence(s) of ex parte communication(s) that result in speeding ticket(s) and/or other minor infraction(s) being remanded to the file.[1] In stark contrast, Judge Bradford improperly dismissed multiple proceedings involving infractions that hardly qualify as minor, to wit: (1) violations of protective orders, (2) second-offense DUI, (3) first-offense DUI by a minor. If these infractions are “akin” to run-of-the-mill, ticket-fixing cases, they are distant relatives from the illegitimate side of the family. Once again, any one of these three separate acts, standing alone, would merit the sanctions prescribed today.
C. WARRANTS
¶ 31. Judge Bradford’s improper issuance of warrants resulted from his modification of a domestic-abuse protective order to add the mother and sister of the originally-restrained party, without notice, hearing, or evidence. This exercise of nonsanctioned governmental abuse against the citizens of this State must be castigated, lest our citizens enjoy no more protection from our Constitution than they could expect from the courts of a totalitarian regime. The joint memorandum brief states, “[Judge Bradford] ordered the deputy clerk to issue contempt warrants against [the two women], though no charges had ever been filed against them ... nor were they notified to be present at the hearing....” The Commission found that Judge Bradford’s actions were similar to those of Judge Carr. See Miss. Comm’n on Judicial Performance v. Carr, 990 So.2d 763, 765 (Miss.2008). Judge Carr was ordered by this Court to be publicly reprimanded, suspended for sixty days, fined $2,000, and assessed costs of $100. Id. at 771. The majority distinguishes Carr based on prior actions taken by the Court, yet fails to take into account the ten separate complaints, presented to this Court as one action. Likewise, this complaint, standing alone, merits the sanctions imposed.
D. UNIFORM RULES
¶ 32. Judge Bradford also violated the Uniform Rules of Procedure for Justice Court. In two cases, scheduled on the same day, involving the same defendant landlord, all parties failed to appear. The judge continued- one case and dismissed the other without prejudice, both actions in direct conflict with the rules. Such actions give the impression that litigants can flout the rules of the court without consequence (that is, if Judge Bradford is presiding, and is of a mind to violate mandatory procedural rules).
II.
¶ 33. This Court has clearly signaled to the Commission that it is time for the sun to set on the “good ole boys” days, as this Court increasingly has shown its disdain for judicial misconduct and has enhanced sanctions beyond those recommended by *261 the Commission.[2] We repeatedly have given the following admonition, “Official integrity of our Justice Court Judges is vitally important, for it is on that level that many citizens have their only experience with the judiciary.” Miss. Comm’n on Judicial Performance v. Vess, 10 So.3d 486, 493 (Miss.2009) (quoting In re Inquiry Concerning Garner, 466 So.2d 884, 887 (Miss.1985)).
¶ 34. Beginning with Sanford and Gordon, this Court imposed more stringent standards regarding misconduct by judges. See Gordon, 955 So.2d at 306; Sanford, 941 So.2d at 218. In each case, this Court increased the recommended sanction by adding a thirty-day suspension. See id. Each case was presented as a single complaint. See id. Judge Sanford admitted to having told the county sheriff to order a deputy to be late for a hearing so that the judge could dismiss a DUI charge. Sanford, 941 So.2d at 210. The sheriff complied with this, and the deputy waited until after the DUI case had been dismissed, and then arrived to testify in other cases. Id. Judge Gordon, a municipal judge, admitted to having had ex parte communications that led to the passing of fourteen speeding tickets to the file in a single day. Gordon, 955 So.2d at 302. In each case, the Court signaled a change in policy by citing former cases in which a public reprimand and the assessment of costs had been considered the appropriate sanction. See Gordon, 955 So.2d at 306; Sanford, 941 So.2d at 216 n. 3.
¶ 35. In Sanford, this Court, despite the Commission’s finding to the contrary, found that Judge Sanford’s conduct also involved moral turpitude. See Sanford, 941 So.2d at 216-17. In Gordon, this Court also found that the conduct involved moral turpitude, and furnished a standard for consideration of moral turpitude, as follows:
The bottom line of this element is that we must determine whether a judge’s conduct crosses the line from simple negligence or mistake, to willful conduct which takes advantage of a judge’s position for greed or other inappropriate motives. If the conduct willfully subverts justice, more punishment is warranted. In this instance, we hold that “fixing tickets” willfully subverts justice; therefore, Judge Gordon has crossed the line of moral turpitude.
Gordon, 955 So.2d at 305-06. In the instant case, both the Commission and the majority cite Mississippi Commission on Judicial Performance v. Gibson, 883 So.2d 1155, 1157 (Miss.2004). The majority acknowledges that Judge Bradford’s conduct involves moral turpitude. His impermissible actions, in the “ticket-fixing” matters alone, satisfy both the Gibson and the Gordon definitions of acts involving moral turpitude; thus enhanced punishment is warranted. See Gordon, 955 So.2d at 305-06; Gibson, 883 So.2d at 1157.
III.
¶ 36. More consideration should be given to both the magnitude of the offenses and the harm suffered. The Commission’s “bundling of complaints,” like a communications company bundles services, is particularly troubling. Is expediency more important than the protection of our citizens and our constitution? The majority acquiesces to this procedural ploy by reducing the ten complaints of misconduct to four categories. The majority then ana *262 lyzes the categories separately (but never in toto) to compare to the separate violations of similar judicial-misconduct cases. I submit, this Court has not seen a case quite like this one. Thus, the analysis fails to take into consideration Judge Bradford’s overall dismal breach of judicial canons. Many of the cited cases involve judges who committed only one category of misconduct, brought on a single complaint, but not the diversity of violations that triggered ten complaints.
¶ 37. Little weight is given to the finding that Judge Bradford’s misconduct constituted a pattern, as the Court adopts the Commission’s recommendation because this is the first time Judge Bradford has been before the Commission and this Court. I cannot agree that this is the road we should travel. A pattern of multiple and unrelated egregious misconduct is deserving of an enhanced sanction. A pattern is a pattern, regardless of whether it comes to us in one or multiple proceedings. We should not ignore a multiplicity of misconduct, just because multiple complaints of judicial misconduct are presented to this Court in one package. This case involves ten separate complaints involving eleven cases before Judge Bradford, which directly affected eighteen separate citizens, as well as other officers of the court, a county prosecutor, and another justice court judge.
¶ 38. This is not a matter of one act of misconduct resulting in multiple violations of the Code of Judicial Conduct. The application of a blanket, first-time-offender rule, if followed in all courts of general jurisdiction, would mandate all first-time offenders (not just the deserving) being given special consideration just because they were able to commit a long list of crimes before being brought to justice. See U.S. v. Madoff, 626 F.Supp.2d 420 (S.D.N.Y.2009); U.S. v. Madoff, 2009 WL 1055792 (S.D.N.Y.2009). Despite the fact that it was Bernard Madoffs first time before the bar of justice, he was given the maximum statutory sentence of 150 years in prison for the eleven counts in the indictment. See Diana B. Henriques, Madoff Is Sentenced to 150 Years for Ponzi Scheme, N.Y. Times, June 30, 2009, at A1.
¶ 39. In his pre-sentencing statement to Madoff, the judge recognized that such a long sentence “would be largely symbolic” for the seventy-one-year-old defendant, but explained that “ ‘symbolism is important for at least three reasons’ ... citing the need for retribution, deterrence and a measure of justice for the victims.” Id. The judge added that the victims were “ ‘placing their trust in the system of justice.’ ” Id. Similarly, our Court has affirmed maximum or near-maximum statutory sentences in criminal cases, despite a defendant’s status as a first-time offender. See Ford v. State, 975 So.2d 859, 870 (Miss.2008); Burchfield v. State, 892 So.2d 191, 202 (Miss.2004). See also Alexander v. State, 979 So.2d 716, 718 (Miss.Ct.App.2007); Pittman v. State, 904 So.2d 1185, 1194 (Miss.Ct.App.2004). To consider sanctions differently for offending judges is an affront to every citizen who expects (and deserves) protection from unjust proceedings in all courts, justice court included. Sanctions always should take into account “retribution, deterrence, and a measure of justice” for those who place their “trust in the system of justice.” See Henriques, supra.
¶ 40. The majority’s finding that the number of complaints is not so extraordinary as to change this Court’s clear precedent begs the question: What is an ordinary number of complaints? The claim of clear precedent is somewhat dubious, as we have, on more than one occasion, imposed greater sanctions than those recommended by the Commission.
¶ 41. Likewise, our judicial-performance jurisprudence is not of long standing. *263 The first case from the Commission was In re Anderson, 412 So.2d 743 (Miss.1982). That opinion chronicled the creation of the Commission as follows:
By concurrent resolution passed in 1979, the Legislature submitted to the people a proposed amendment to Article 6 of the Mississippi Constitution of 1890 by adding Section 177A, which was ratified by the electorate November 6, 1979, and thereafter became a part of our State Constitution.
Id. at 744. This Court heard no judicial-performance cases prior to the formation of the Commission. Then (as it does now), the Legislature had the power, “on the joint address of two-thirds of each branch of the legislature,” to direct the governor to remove a judge. See Miss. Const, art. 4, § 53. Thus, we have dealt with these issues for only twenty-seven years, with the last three signaling our enhancing penalties when warranted. See Gordon, 955 So.2d at 306; Sanford, 941 So.2d at 218.
¶ 42. The majority cites Mississippi Commission on Judicial Performance v. Osborne, 977 So.2d 314 (Miss.2008). If Osborne proves anything, it reveals that this Court can and will enhance a sanction when we deem it appropriate. In Osborne, we doubled the recommended penalty. Id. at 316. Judge Osborne’s conduct was in full view of the public, but is such visible conduct any more dangerous to true justice than backroom phone calls and conferences, and secret orders suspending citizens’ rights without notice or hearing? Id. at 317. I suggest just the opposite. Considering the quantity, character, and consequences of Judge Bradford’s misconduct, a more severe sanction is warranted.
CARLSON, P.J., JOINS THIS OPINION.

. See Miss. Comm'n on Judicial Performance v. Warren, 791 So.2d 194 (Miss.2001); Miss. Comm’n on Judicial Performance v. Boykin, 763 So.2d 872 (Miss.2000); Miss. Comm'n on Judicial Performance v. Bowen, 662 So.2d 551 (Miss.1995); Miss. Comm'n on Judicial Performance v. Gunn, 614 So.2d 387 (Miss.1993).

. Miss. Comm'n on Judicial Performance v. Osborne, 977 So.2d 314 (Miss.2008); Miss. Comm'n on Judicial Performance v. Fowlkes, 967 So.2d 12 (Miss.2007); Gordon, 955 So.2d at 300; Sanford, 941 So.2d at 209; Miss. Comm'n on Judicial Performance v. Britton, 936 So.2d 898 (Miss.2006); Gibson, 883 So.2d at 1155.