Matthew Grant Brand appeals his April 12, 2005, conviction by the Franklin County Circuit Court of unlawful manufacture of a controlled substance in violation of § 13A-12-217, Ala. Code 1975; unlawful possession of marijuana in the second degree in violation of § 13A-12-214, Ala. Code 1975; and possession of drug paraphernalia in violation of § 13A-12-260, Ala. Code 1975. On May 25, 2005, the trial court sentenced Brand to 15 years' imprisonment; that sentence was split and Brand was ordered to serve 2 years for the conviction for unlawful manufacture of a controlled substance, one year for the conviction for second-degree marijuana possession, *Page 320 
and six months for the drug-paraphernalia conviction. He was also ordered to pay $150 to the Crime Victims Compensation Fund in accordance with § 15-23-17(b), Ala. Code 1975, and $100 to the Forensic Trust Fund in accordance with § 36-18-7, Ala. Code 1975.
On January 2, 2002, Russelville Police officer Scotty Lowry received a telephone call from the manager of the Russelville Wal-Mart discount department store notifying him that two white males had purchased materials that could be used in the manufacture of methamphetamine. The manager also provided Officer Lowry the tag number of the automobile in which the individuals left the Wal-Mart parking lot. The vehicle, which was unoccupied, was located in the parking lot of the Franklin Shopping Center. Police set up surveillance and watched as Brand and Morgan exited Rite-Aid pharmacy and entered the vehicle. Police saw several bags inside the vehicle in plain view; some of them were transparent and contained boxes of cold and allergy medications.
The evidence indicated that at 10:43 a.m. on January 2, 2002, Brand purchased three boxes of allergy medicine containing pseudoephedrine and three packages of AA lithium batteries from the Wal-Mart discount store. At 10:44 a.m. at a different cash register in the same Wal-Mart store, Morgan purchased three boxes of tablets containing pseudoephedrine. At 10:58 a.m., Brand purchased three boxes of tablets containing pseudoephedrine at the Russellville Family Dollar discount store. At 11:08 a.m., Brand purchased from the Rite-Aid store in Russellville 3 boxes of 48-count tablets containing pseudoephedrine. At 11:11 a.m., Morgan purchased 2 boxes of 48-count tablets containing pseudoephedrine at the same Rite-Aid. In total, Brand and Morgan had purchased 14 boxes of medicines containing pseudoephedrine in less than 30 minutes.
 I.
As best as we can discern from Brand's brief,[1] he appears to argue that the trial court committed reversible error when it permitted Officer Lowry to read the ingredients label on the boxes of medication that had been introduced as exhibits during the trial. As we have previously stated, "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Kennedy v. State, 929 So.2d 515,519 (Ala.Crim.App. 2005), quoting Ex parte Loggins,771 So.2d 1093, 1103 (Ala. 2000).
During the trial, the State introduced into evidence boxes of cold and allergy medicine purchased by Brand on January 2, 2002. The State then asked Officer Lowry to read the ingredients listed on each box. Brand objected, contending the information contained on the box was hearsay. The trial judge overruled the objections. *Page 321 
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala. R. Evid. Generally, hearsay is not admissible, unless it comes within an exception by the Alabama Rules of Evidence, by statute, or by other rules adopted by the Supreme Court of Alabama. Rule 802, Ala. R. Evid. In this matter, the label on a medicine box is hearsay because it is a written assertion "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and would not be admissible unless some exception applied. Rules 801(c) 802, Ala. R. Evid.
However, Rule 803(17), Ala. R. Evid., provides that "[m]arket quotations, tabulations, lists, directories, or other published complications, generally used and relied upon by the public and by persons in particular occupations" are excluded from the hearsay rule. The question whether pharmaceutical labeling falls within this exception to the hearsay rule is one of first impression for Alabama appellate courts.
Given the widespread epidemic of illegal methamphetamine production, other jurisdictions with rules identical to Rule 803(17), Ala. R. Evid., have addressed this issue. In Statev. Heuser, 661 N.W.2d 157 (Iowa 2003), the Iowa Supreme Court held that pharmaceutical labeling falls within the market-report exception to the Iowa Rules of Evidence, which exception is identical to Alabama's Rule 803(17). Regarding the labels of boxes of cold medication, the Iowa Supreme Court held:
 "The applicable state and federal regulations suggest the cold medication labels are accurate and trustworthy. Additionally, the contemporary nature of pharmaceutical practice exemplifies the inherent trustworthiness of cold medication labels.
 "`In this modern day, thousands of pharmaceuticals are compounded, processed, or produced, and then packaged and labeled for distribution in that package for direct sale to a customer unopened, and frequently under seal, and as the modern advertising puts it "untouched by human hands." This is no longer an age when the processor puts the ingredients into a vial with an "eye-dropper," with highly variable results appearing in the finished "preparation," but an era characterized by automatic mixing, measuring, and filling apparatus, the entire productive process being controlled by electronic and nucleonic gauges, measuring to infinitesimal precision, to produce an absolute result in meeting a required standard. This is the process that brings to a pharmacist an "exempt" preparation, properly labeled as required by statute, and in this case a label . . . specifically designed to make that preparation more quickly identifiable.'
 "State v. Mitchell, 18 Ohio App.2d 1, 246 N.E.2d 586, 589 (1969). For all these reasons, over-the-counter drug labels are generally relied upon as accurate."
661 N.W.2d 157, 164 (Iowa 2003).
Using the same reasoning as the Heuser court, the Indiana Supreme Court likewise held that cold-medicine labeling falls within Indiana's "market report" exception, which is identical to Alabama's "market report" exception to the hearsay rule. Reemer v. State, 835 N.E.2d 1005 (Ind. 2005). The Mississippi Supreme Court, relying on the reasoning ofHeuser, has also held that cold-medicine labeling falls under Mississippi's "market report" exception to the hearsay rule, which is also identical to Alabama's "market report" exception. Burchfield v. State, 892 So.2d 191 *Page 322 
(Miss. 2004). Similarly, the intermediate appellate courts in two other states have held that the labeling of cold medicine fall within the "market report" exception to the hearsay rule.See People v. Shevock, 335 Ill.App.3d 1031,782 N.E.2d 949, 270 Ill.Dec. 390 (2003) and Shaffer v.State, 184 S.W.3d 353 (Tex.Ct.App. 2006).
We find the reasoning of the Iowa Supreme Court in its "market list" analysis persuasive; thus, we hold that the labeling found on cold-medicine boxes falls within the "market list" exception in Rule 803(17) to the hearsay rule. The Alabama Safe Foods Act of 2000 makes it illegal for drugs to be mislabeled in Alabama. § 20-1-26, Ala. Code 1975. Likewise, federal statutes prohibit such mislabeling. As the Mississippi Supreme Court aptly stated:
 "We cannot imagine any hearsay evidence more trustworthy and relied upon by the public than the ingredients label on an unopen box of medication purchased from a drug store. The Food and Drug Administration regulates over-the-counter medications. Failure to properly list the ingredients places the pharmaceutical manufacturer in peril."
Burchfield, 892 So.2d at 198.
The labels on the boxes of medicine are required by state and federal law. The boxes of cold medicine Brand possessed were in the original packages. Neither the boxes nor the "blister" packs were opened. The fact that the pills were in the original, unbroken packages indicates that the contents had not been changed since the manufacture packaged them. The labeling on the boxes clearly listed pseudoephedrine hydrochloride as one of the active ingredients in each pill. The ingredients labels on the boxes qualify as a "market list" that is "generally used and relied upon by the public. . . ." Rule 803(17), Ala. R. Evid.
Thus, the trial court properly allowed Officer Lowry to read the ingredients labels on the boxes of cold medication to the jury. Brand is not entitled to any relief as to this claim.
 II.
Brand next argues that the trial court erred when it denied his motion for a judgment of acquittal. Brand's argument is premised on the notion that the evidence showed he had only one precursor substance and that § 13A-12-217, Ala. Code 1975, requires that the evidence show that more than one precursor substance was in his possession in order to sustain a conviction for the unlawful manufacture of a controlled substance. However, in light of our recent decision in O'Callaghan v. State, [Ms. CR-04-1941, Feb. 3, 2006] ___ So.2d ___ (Ala.Crim.App. 2006), Brand's argument is without merit.
In O'Callaghan, the appellant argued that insufficient evidence was presented to obtain a conviction because the evidence at trial indicated that he was in possession of only one precursor substance. Holding that §13A-12-217, Ala. Code 1975, requires the introduction of evidence of possession of only a singular precursor substance, we noted:
 "There is no indication that the legislature, in the face of a growing methamphetamine epidemic at the time of the enactment of § 13A-12-217 in 2001, intended to relax the threshold and require the possession of more than one precursor substance used in the manufacture of methamphetamine in order to establish that a person has committed the crime of unlawful manufacture of a controlled substance."
O'Callaghan, ___ So.2d at ____.
Because § 13A-12-217 does not require evidence of plural precursor substances, *Page 323 
the trial court properly denied Brand's motion for a judgment of acquittal.
 III.
During the trial, the State introduced for impeachment purposes various receipts dated December 2001 for cold medicine that had been found in the automobile driven by Brand.[2] As best as we can tell, Brand argues that he was prejudiced by the introduction of this evidence because he was not provided copies of these receipts during discovery. Brand alternatively argues that the evidence was not introduced for impeachment purposes and that the prejudicial effect of this evidence outweighs its impeachment value.
Before trial, Brand filed a motion for production and disclosure of information and other items. The trial court entered an order requiring the State "[t]o permit [Brand] to analyze, inspect, and copy or photograph books, papers, documents . . . or portions of any of these things, which are within the possession, custody or control of the State and . . . which were obtained from or belonged to [Brand]." While Brand refutes that the receipts belonged to him, the evidence showed that they were obtained from his vehicle. Thus, these documents should have been produced to Brand during the course of discovery.
While Brand should have received these items during the course of discovery, we note that "`the remedy for violations of discovery rules [rests] within the sound discretion of the trial court.'" Morrison v. State, 601 So.2d 165, 173
(Ala.Crim.App. 1992), quoting Buchannon v. State,554 So.2d 477, 486 (Ala.Crim.App. 1989). When the State introduced this evidence for impeachment purposes, Brand objected that the evidence had not been disclosed during the course of discovery. Brand did not ask for any curative measure under Rule 16.5, Ala. R.Crim. P. Under Rule 16.5, Ala. R.Crim. P., the trial court could have continued the trial, prohibited the State from introducing the evidence that had not been disclosed, or entered any other order it deemed just under the circumstances. The trial court gave the jury the following curative instruction:
 "THE COURT: Ladies and gentlemen of the jury, the documents that are about to be utilized will be used for credibility purposes only, for impeachment purposes only. It is not evidence for your consideration that this defendant is guilty of anything contained in the indictment, it is strictly for credibility only."
(R. 314.) We find no abuse of discretion on the part of the trial court; thus Brand is not entitled to any relief as to his claim.
Brand also alleges that the receipts were not used for impeachment purposes. The record, however, indicates otherwise. Before the State introduced the receipts, the following exchange occurred:
 "Q. [Prosecutor]: Now, what vehicle did y'all leave in?
 "A. [Brand]: We left in my, now, wife's. Then she was my girlfriend.
 "Q. Your wife's vehicle?
 "A. Uh-huh.
 "Q. As you said, you've driven that vehicle before; right?
 "A. Several times.
 "Q. And when you weren't driving, your wife was driving; right?
 "A. Yes, sir.
 "Q. Had you ever used that vehicle to buy pseudoephedrine, other ingredients *Page 324 
to methamphetamine in other places?
 "A. Never before.
 "Q. And so would there be any other records or receipts in that vehicle for the similar-type materials that we see here?
 "A. Not that I know of."
(R. 312-13.) After this exchange the State informed the trial court that it would be using the receipts for impeachment purposes, and the trial court gave a limiting instruction to the jury regarding the use of that evidence for impeachment purposes. That evidence was clearly used for impeachment purposes pursuant to Rule 607, Ala. R. Evid.; thus Brand's assertion lacks validity.
Brand argues that the prejudicial effect of this evidence outweighed its impeachment value. "`[T]he latitude and extent of cross-examination is a matter which of necessity rests largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.'" Southern Energy Homes, Inc. v.Washington, 774 So.2d 505, 515 (Ala. 2000), quotingState v. Howington, 268 Ala. 574, 575, 109 So.2d 676, 677
(1959). As our Supreme Court has recognized, "All impeachment evidence is prejudicial to some extent. It is only when the probative value of the impeachment evidence issubstantially outweighed by its prejudicial impact that it should be excluded." Southern Energy Homes, Inc. v.Washington, 774 So.2d at 516 (Ala. 2000). The probative value of the receipts as impeachment evidence is not substantially outweighed by its prejudicial impact. Therefore, there was no abuse of discretion on the part of the trial court in permitting this evidence to be used for impeachment purposes. Brand is thus not entitled to any relief as to this claim.
For all the foregoing reasons, we affirm the judgment of the Franklin Circuit Court.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[1] We note that Brand's brief barely meets the minimal requirements of Rule 28(a), Ala. R.App. P. As the Supreme Court has held
 "Appellants who fail to comply with [Ala.] R.App. P. 28(a) place themselves in a perilous position. While we attempt to avoid dismissing appeals or affirming judgments on what may be seen as technicalities, we are sometimes unable to address the merits of an appellant's claim when the appellant fails to articulate that claim and presents no authorities in support of that claim. Under appropriate circumstances we will refuse to consider the appeal."
Stover v. Alabama Farm Bureau Ins. Co.,467 So.2d 251, 253 (Ala. 1985). While Rule 28 has been amended significantly since Stover, those changes have not affected the holding in that case.
[2] Brand testified at trial that the vehicle he was driving belonged to his girlfriend.