Rel: August 22, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

————————————————

## CR-2024-0103

————————————————

## Jonathan Fitzgerald Lockett

### v.

## State of Alabama

## Appeal from Jefferson Circuit Court
## (CC-21-347, CC-21-377, CC-21-378, CC-21-1004, CC-21-1005, CC-21-1006, CC-21-1331, CC-21-1332, CC-21-1466, CC-21-1467, and CC-21-1468)

ANDERSON, Judge.

Jonathan Fitzgerald Lockett[1] appeals his convictions for first-degree rape, first-degree sodomy, sexual torture, first-degree robbery, and second-degree theft of property. On appeal, Lockett asserts 2 arguments: (1) that the Jefferson Circuit Court abused its discretion when it consolidated 12 charges against him that were brought in separate indictments and related to 5 different victims and (2) that the circuit court abused its discretion when it allowed the State to show the jury footage depicting his sodomizing an unidentified victim, for which he was not charged. For the reasons set forth in this opinion, we find no merit to either claim.

However, even though Lockett does not challenge his two convictions for first-degree robbery of C.P., for the reasons set forth below we reverse and remand as to case number CC-21-347. Because Lockett's convictions for first-degree robbery were based on different methods of proving the same criminal act of robbery committed against the same victim, those convictions violate double-jeopardy principles. In Ex parte

---

[1]The indictments returned against Lockett indicated multiple aliases, including "Master Antonio Lockett," "Master Antonio Jay Ramsey Lockett," "Jonathan Lockett," "John Lockett," and "Master Lockett." (C. 104-07.)

<u>Rice</u>, 766 So. 2d 143, 152 (Ala. 1999), the court found that it was not "an acceptable option to merely vacate one … conviction[] and its corresponding sentence" because such an action by the appellate court "would have the effect, albeit unintended, of nullifying a part of the jury's verdict." On remand, therefore, the circuit court must enter a new order, one that adjudges the defendant guilty of the single offense first-degree robbery as to C.P. and "sentences him for that single offense." <u>Id.</u> at 152-53.

<u>Facts and Procedural History</u>

A Jefferson County grand jury indicted Lockett and charged him with several sex and theft crimes committed against different victims:

- In case number CC-21-347, two counts of first-degree robbery as to victim C.P.;

- In case number CC-21-377, one count of first-degree rape as to victim C.P.;

- In case number CC-21-378, one count of first-degree sodomy as to victim C.P.;

- In case number CC-21-1004, one count of sexual torture as to victim S.K.;

- In case number CC-21-1005, one count of first-degree robbery as to victim S.K.;

3

- In case number CC-21-1006, one count of first-degree sodomy as to victim S.K.;

- In case number CC-21-1331, one count of first-degree sodomy as to victim L.S.;

- In case number CC-21-1332, one count of second-degree theft as to victim L.S.;

- In case number CC-21-1466, one count of first-degree sodomy as to victim J.W.;

- In case number CC-21-1467, one count of first-degree robbery as to victim J.W.;[2] and

- In case number CC-21-1468, one count of first-degree sodomy as to victim K.R.

(C. 1177-88.) Before trial, the State moved to consolidate the charges against Lockett, and the circuit court granted that motion over Lockett's objection. (C. 1609-10; R. 21.)

The State's evidence showed that, in a nearly one-year period spanning from late 2019 to late 2020, Lockett committed numerous sexual assaults and thefts in areas close to his two Birmingham residences. The first sexual assault and theft occurred in October 2019 and was committed against L.S., who worked as a prostitute in

---

[2]Lockett was also charged with first-degree rape against J.W. in case number CC-21-1329, but the State voluntarily dismissed that charge during its case-in-chief. (R. 543.)

Birmingham. (R. 103-05.) L.S. posted online advertisements seeking clients, and Lockett responded to one of them. (R. 105-06.) Lockett told L.S. to meet him at an address on First Avenue South. (R. 111-12.) When L.S. arrived, she realized the address was for a house near a church. (R. 112-13.) She carried a purse containing her cellular telephone and a purple and black pistol. (R. 116.) Lockett eventually met L.S. at her car, gave her some money, and led her to a laundry room located at the rear of the house. (R. 113-16, 118-19.)

Although Lockett was initially friendly, when he and L.S. entered the laundry room Lockett pushed her over, gripped her hair, and said, "[b]itch, you know what we came here to do." (R. 118-19.) Lockett then grabbed L.S.'s pistol, took the money he gave her, and forced her to engage in nonconsensual vaginal sex and anal penetration with his fingers.[3] (R. 119-21.) According to L.S., she and Lockett discussed engaging in oral and vaginal sex, but she never agreed to engage in anal sex. (R. 129-30, 134.) The sexual contact was not consensual, and it did

---

[3]Additional evidence supported a finding that Lockett also penetrated L.S. with his penis. Specifically, semen matching Lockett's DNA was found in the rectal swab from L.S.'s sexual-assault exam, and Lockett himself testified that he anally penetrated her with his penis. (R. 204-05, 314-15, 561.)

5

not occur until after Lockett took L.S.'s pistol. (R. 134-35.) Lockett also recorded the assault, and the footage depicted L.S. saying "oh, God, please no." (R. 121-23.)

Lockett eventually stopped and left, but he took the pistol with him. (R. 121.) L.S. left the scene of the attack and drove to a nearby pawn shop and called emergency 911. (R. 123.) She then went to a local crisis center where a sexual-assault examination was performed. (R. 126.) L.S. reported significant pain in her back and anal area. (R. 174.) The nurse conducting the examination observed no vaginal injuries, but she identified an abrasion inside L.S.'s anus. (R. 179-80.) A forensic biologist with the Alabama Department of Forensic Sciences (the "ADFS") confirmed the presence of semen on the vaginal, genital, and anal swabs taken during L.S.'s exam. (R. 204-05.) A later comparison of the semen to Lockett's DNA sample indicated it was Lockett's semen. (R. 314-15.)

The next victim, C.P., worked as a prostitute in Birmingham in December 2019. (R. 211-14.) Lockett responded to her online advertisement, and the two exchanged text messages over multiple days. (R. 215-16, 220.) They eventually agreed on a price, and Lockett told C.P.

to meet him at a different address on First Avenue South.[4] (R. 222.) The address was for a house; when C.P. arrived, she parked in an alley behind the house, and Lockett led her into the garage. (R. 224-25.)

Lockett then paid her $100, and they started engaging in consensual oral and vaginal sex. (R. 226-29.) At some point, they negotiated a price for anal sex, but C.P. stopped the encounter when Lockett exceeded his time and refused to pay additional money. (R. 229-32.) As she attempted to leave, Lockett retrieved a pistol and told C.P. "[y]ou're going to finish or I'll kill you." (R. 232.) Lockett then pointed the pistol at C.P.'s head and forced her to engage in oral, vaginal, and anal sex. (R. 232-34.) He eventually stopped, but as C.P. got dressed, Lockett demanded she return the money he paid her. (R. 234-35.) C.P. refused, and Lockett said he would "fucking kill [her]" before pistol whipping C.P. in the face and rendering her unconscious. (R. 235-36.) When she came to, her purse and cellular telephone were gone. (R. 236.) C.P.'s roommate eventually took her to hospital for her injuries -- she was in "excruciating pain …. [Her] tooth [wa]s busted. [Her] lip [wa]s messed up. [Her] nose

---

[4]The attacks and thefts against L.S. and C.P. both occurred within the distance of one to two houses from Lockett's house on First Avenue South. (R. 526-27; State's Ex. 173.)

[wa]s broken and [her] eye was crushed." (R. 238-39, 241.) C.P. suffered a permanently dilated pupil, complete blindness, and her eye "was detached from the optic nerve and bleeding into [her] brain." (R. 242-43.)

About one week later, C.P. met Lockett again. C.P. was unaware that she was meeting Lockett on this occasion, however, because he concealed his identity. (R. 246.) When she arrived at the agreed-upon location, Lockett again held her at gunpoint and forced her to engage in sexual intercourse. (R. 246.)

In April 2020, J.W. used a friend's online advertisement to solicit prostitution clients. (R. 257-59.) Lockett responded to the advertisement, and the two scheduled a meeting at an apartment complex in the Eastlake area of Birmingham. (R. 259-62.) When J.W. arrived, Lockett entered her car and directed her to a nearby alley that adjoined an abandoned house. (R. 261-63.) After J.W. parked, the two moved into the back seat and engaged in consensual sex. (R. 263-64.) At some point, however, Lockett retrieved a purple pistol, put it to J.W.'s head, and forced her to engage in anal sex. (R. 264.) He photographed the encounter using his cellular telephone. (R. 266.)

8

When Lockett finished, he took J.W.'s keys and I.D. and walked away from the car. (R. 266.) But when he heard police sirens, he threw J.W.'s keys and I.D.; she only recovered her keys. (R. 266-67.) J.W. then called emergency 911 and went to a local crisis center for a sexual-assault examination. (R. 268, 291.) From the evidence collected during that examination, the ADFS was able to generate a genetic profile from male DNA present on J.W.'s rectal swab, and subsequent comparisons revealed that the DNA matched Lockett's genetic profile. (R. 310-13.)

In July 2020, S.K. lived out of her car in Birmingham. (R. 318-20.) One day, while S.K. was outside a gas station seeking a ride to an auto-parts store, Lockett pulled up and offered her a ride. (R. 320-24.) He told S.K. that he was an Uber driver and that she could ride in the back seat. (R. 324.) After S.K. entered the car, Lockett told her that "his wife . . . gives him money to get women to have anal sex." (R. 325.) Then, instead of driving to the auto-parts store, Lockett drove them to a grass field. (R. 326.) S.K. tried to escape but could not because Lockett had activated the child-safety locks. (R. 326.) Lockett parked his car, relocated himself to the back seat, forced S.K. down, and anally sodomized her. (R. 327-28.)

He eventually stopped, got back in the driver's seat, and drove to an alley in Birmingham's Ensley neighborhood. (R. 330.)

Lockett then parked behind a house, exited the car, and removed S.K. from the back seat. (R. 330.) Lockett took S.K.'s purse -- which contained her keys, wallet, and I.D. -- and put them in the trunk of the car. (R. 330-31, 333.) When S.K. resisted, Lockett retrieved a purple pistol from the driver's side door and inserted the barrel into her anus. (R. 331-32.) After pointing the pistol at S.K.'s head, Lockett ultimately reentered his car and drove away. (R. 334.) S.K. walked to a nearby gas station and called emergency 911. (R. 334-35.) She went to a local crisis center, but she did not submit to a sexual-assault examination. Instead, S.K. asked to be returned to her car because she thought Lockett might attempt to steal her car. (R. 335.)

Finally, in November 2020, K.R. decided "to go on dates with guys for money" because she was homeless and unemployed. (R. 352-53.) She posted an online advertisement, and Lockett responded. (R. 355-56.) They agreed to engage in vaginal sex, and Lockett picked her up where she was staying in west Birmingham. (R. 358.) When he arrived, Lockett told K.R. that he was an Uber driver and instructed her to get into the

10

back seat of his car. (R. 359.) Lockett told K.R. they were going to his friend's house, but he drove to an alley behind a house. (R. 360-61.) Lockett said they could not go inside the house, so K.R. undressed behind the car before Lockett led to her to steps running from the alley down to the house. (R. 361-62.)

Despite agreeing to vaginal sex, Lockett inserted his penis into K.R.'s anus, conduct to which she did not consent. (R. 357, 363, 377.) K.R. protested, telling Lockett to "[s]top" and stating "no, it hurts." (R. 363.) Lockett, however, continued, telling K.R. that "[i]t will just take a few minutes." (Id.) Lockett eventually stopped, the pair reentered the car, and Lockett drove K.R. to a nearby car wash. (R. 364-68.)

Although Lockett agreed to drive K.R. home, he left the car wash and drove toward the location of the assault. (R. 368-69.) He eventually pulled into the McCoy Center parking lot. (R. 370.) Lockett exited the car, went to the back door, and dragged K.R. out of the back seat. (R. 370-71.) K.R. screamed, and Lockett choked her while pulling her across the parking lot. (R. 371.) People working in the McCoy Center ran to the parking lot and told Lockett they were calling the police. (R. 372, 403.) Lockett responded by running to the car and opening the trunk, but K.R.

slammed the trunk down and got Lockett's tag number. (R. 372-73.) Lockett then tried to wrestle K.R.'s phone away, so she threw it over a nearby fence. (R. 373-74.) Lockett jumped over the fence, retrieved the phone, and then got into his car and fled the scene. (R. 374.)

K.R. went to a local crisis center, where a sexual-assault examination was performed. (R. 375.) K.R. reported significant pain in her rectal area and told the examining nurse that Lockett had strangled her. (R. 436-38.) According to the nurse, K.R.'s injuries were consistent with being strangled. (R. 439.)

Police officers eventually arrested Lockett in November 2020. (R. 452.) Thereafter, law-enforcement officers executed a search warrant at Lockett's house on First Avenue South. (R. 455.) There, officers discovered a box containing cellular telephones, and a total of 36 phones were seized at the house. (R. 458-59.) Lockett's girlfriend, with whom he shared the residence, later provided law enforcement with an additional 10 cellular telephones. (R. 504.) Amongst the seized items were C.P.'s Social Security card as well as C.P.'s and S.K.'s cellular telephones. (R. 509-11.)

Lockett's cellular telephone contained images and videos depicting him engaging in sexual acts with different women. Officers were also able to determine that Lockett's phone was present at or near the locations of five of the sexual assaults when they occurred. (R. 519-33.) Officers also determined that the sexual assaults occurred near two houses associated with Lockett – one on Seventh Street West and one on First Avenue South. (R. 519-33.) They also discovered three videos -- one depicting L.S., one depicting C.P., and one depicting an unknown victim, a purple gun, and Lockett's driver's license. (R. 35-36, 536.)

According to Lockett, all the sexual encounters in question were either consensual or never occurred. (R. 560-64, 571-76, 589-91, 597, 606-07.)

The jury convicted Lockett of each count in the consolidated indictments. (R. 750-53.) The circuit court sentenced Lockett as follows:

- In case numbers CC-21-347, CC-21-1005, and CC-21-1467, to 30 years' imprisonment, with each sentence ordered to run consecutively except for the sentences for the two robbery convictions in CC-21-347, which the circuit court ordered to run concurrently with each other and consecutively to all other sentences;

- In case numbers CC-21-377, CC-21-378, CC-21-1004, CC-21-1006, CC-21-1331, CC-21-1466, and CC-21-1468, to 99 years' imprisonment with each sentence ordered to run consecutively; and

13

- In case number CC-21-1332, to 2 years' imprisonment, with the sentence ordered to run consecutively with Lockett's other sentences.

(C. 68, 174, 792.) Thereafter, Lockett moved the circuit court for a new trial, arguing that it had abused its discretion when it consolidated the charges against him and when it allowed video footage of him sodomizing an unidentified victim to be shown to the jury for impeachment purposes. (C. 1676-77.) The circuit court denied his motion (C. 1683), and this appeal followed.

## Standards of Review

A trial court "'is vested with substantial discretion in deciding whether to consolidate cases, and its decision as to consolidation will be reversed only for a clear abuse of that discretion.'" Bester v. State, 381 So. 3d 1155, 1164 (Ala. Crim. App. 2022) (quoting Hinkle v. State, 86 So. 3d 441, 446 (Ala. Crim. App. 2011)).

Moreover, the decision to admit or exclude evidence is a matter within the sound discretion of the trial court, and the trial court's determination on such an issue "will not be reversed except upon a clear showing of abuse of discretion." Brownlee v. State, 197 So. 3d 1024, 1035 (Ala. Crim. App. 2015). This is likewise true regarding the admission of

14

impeachment and rebuttal evidence. See Brand v. State, 941 So. 2d 318, 324 (Ala. Crim. App. 2006) (applying an abuse-of-discretion standard to the trial court's decision to admit certain evidence for impeachment purposes); Tillis v. State, 469 So. 2d 1367, 1371 (Ala. Crim. App. 1985) (quoting Norris v. State, 429 So. 2d 649, 650 (Ala. Crim. App. 1982)) ("'The admission of rebuttal evidence is within the discretion of the trial judge.'").

## Discussion

Lockett argues that the circuit court abused its discretion by consolidating the charges against him and that the circuit court abused its discretion by admitting into evidence video footage depicting him sodomizing an unidentified female victim. As explained more fully below, there is no merit to either claim. Lockett's challenge to the consolidation of the separate indictments fails because the consolidated charges were of a similar character, evidence of the individual crimes would have been admissible in each case if they were tried separately, and the evidence could be easily separated by the jury under the circuit court's clear legal instructions. Lockett's argument that the circuit court abused its discretion by admitting into evidence the video depicting him in the act

of sodomizing an unidentified victim fails because that video rebutted Lockett's testimony that he had recorded the sexual encounters underlying the charged offenses for the purpose of proving that they were consensual. Moreover, the video footage contradicted his testimony that he would end a sexual encounter if the woman indicated she was in pain or wished to stop.

Lockett's two convictions for the first-degree robbery of C.P., however, violate double-jeopardy principles. Accordingly, for the reasons set forth below, we must reverse Lockett's two convictions for first-degree robbery in case number CC-21-347 and remand that matter to the circuit court. On remand, the circuit court must  enter a new order, one that adjudges the defendant guilty of the single offense of first-degree robbery as to C.P. and "sentences him for that single offense." Ex parte Rice, 766 So. 2d at 152-53.

## I.

In support of his first assertion of error, Lockett argues that consolidation of multiple indictments involving offenses committed against five different victims for a single trial was erroneous because the standards set forth in Rule 13.3, Ala. R. Crim. P., were not satisfied.

16

(Lockett's brief at 27.) Specifically, he claims that (1) the offenses underlying the indictments were not of the same or similar character, (2) did not involve the same conduct and were not connected in their commission, and (3) were not part of a common scheme or plan because neither identity nor consent were at issue at trial. (Lockett's brief at 28-47.) We disagree.

Before trial, the State moved to consolidate the indictments, arguing that each of the charges against Lockett were of the same or similar character, were based on the same conduct, were connected in their commission, and were part of a common scheme or plan for six reasons: (1) each of the victims had their cellular telephone stolen during the commission of the crime, (2) each of the victims was anally sodomized, (3) each of the victims met Lockett over an internet platform, (4) four of the five victims were sexually assaulted in locations within blocks of each other, (5) four of the five victims alleged that Lockett used a gun during the assault, and three of the four identified the gun as being purple, and (6) three of the five victims had sexual-assault examinations. (C. 1609-10.) In his written response to the State's motion, Lockett argued that (1) the charged crimes were not of the same or similar character because the

17

separate charges would not have been admissible under Rule 404(b), Ala. R. Evid., to show intent, motive, or identity if each victim's cases were tried separately, (2) the charged crimes were not connected in their commission, and (3) the charged crimes were not part of a common plan or scheme because neither identity nor consent were an issue during trial. (C. 1612-22.)

At the hearing on the State's motion, the circuit court observed that "the use of a purple gun is something that is so particular. It's not just the use of any gun, but a purple gun." (R. 18.) The circuit court further observed that "[t]he fact that each victim here was anally sodomized by the defendant is definitely something that makes this different." (Id.) Additionally, the court noted "that all of their cell phones were taken" and concluded that all of these similarities showed "a common scheme or plan or how the defendant is alleged to have gone about committing the crimes." (Id.) During that hearing, Lockett reiterated the arguments presented in his written response to the State's motion to consolidate.[5]

---

[5]We note that in <u>Bester v. State</u>, 381 So. 3d 1155, 1164 (Ala. Crim. App. 2022), this Court recognized that it "has reviewed a ruling on a motion to consolidate when a defendant had made either a specific objection to the motion <u>or</u> moved that the cases be severed pursuant to Rule 13.4, Ala. R. Crim. P." Here, Lockett raised specific arguments

18

(R. 12-14, 15-16, 19-20.) Ultimately, the circuit court granted the State's motion and ordered that the separate indictments be consolidated for a single trial. (R. 21.)

Rule 13.3(c), Ala. R. Crim. P., sets out the standard for consolidation of charges that are brought in separate charging instruments:

> "If offenses … are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together … if the offenses … could have been joined in a single indictment, information, or complaint. However, the court shall not order that the offenses … be tried together without first providing the defendant … and the prosecutor an opportunity to be heard."

Under Rule 13.3(a), Ala. R. Crim. P.,

> "[t]wo or more offenses may be joined in an indictment, information, or complaint, if they:
>
> "(1) Are of the same or similar character; or
>
> "(2) Are based on the same conduct or are otherwise connected in their commission; or
>
> "(3) Are alleged to have been part of a common scheme or plan."

opposing the State's motion to consolidate in both his written response and during the hearing regarding consolidation. Thus, the issue whether the circuit court abused its discretion by consolidating the cases was preserved and is properly before this Court on appeal.

19

Under these rules, consolidation of charges "'is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness.'" <u>Bester v. State</u>, 381 So. 3d 1155, 1164 (Ala. Crim. App. 2022) (quoting <u>Ex parte Hinton</u>, 548 So. 2d 562, 566 (Ala. 1989)). "'[T]he most important consideration in determining whether crimes are similar is whether one offense would have been admissible in the trial of the other.'" <u>Id.</u> (citation omitted). Notably, this Court "has [previously] upheld the consolidation of cases involving rape and sexual abuse." <u>Id.</u> at 1165.

In these cases, the circuit court was within its discretion when it consolidated the separate indictments for a single trial for three reasons. First, the offenses committed against each the five victims were of the same or similar character. At the outset, we note that because the indictments in case numbers CC-21-347, CC-21-377, and CC-21-378 were all based on the same conduct directed against C.P., or were otherwise connected in their commission, consolidation of those indictments for a single trial would have been permissible under Rule 13.3(a)(2), Ala. R. Crim. P. Similarly, consolidation of case numbers CC-21-1004, CC-21-1005, and CC-21-1006 for a single trial would have been permissible as

20

to victim S.K.; and the same would be true as to case numbers CC-21-1331 and CC-21-1332, charging Lockett with offenses against L.S., and case numbers CC-21-1466 and CC-21-1467, charging Lockett with offenses against J.W. Because those separate indictments would have been properly consolidated under Rule 13.3(a)(2) as involving the same conduct committed against a single victim, the relevant question before this Court is whether the crimes committed against C.P., S.K., L.S., J.W., and K.P. were sufficiently similar in character to permit consolidation of each victim's cases with the others.

In Bester, the defendant was charged with first-degree rape and first-degree kidnapping of two separate victims, and he was charged with first-degree sodomy of one of those victims. Aside from the fact that both cases did not involve an act of sodomy, the facts of the separate offenses were similar -- the defendant lured the victims into his car by offering to drive each of them somewhere. Id. at 1159-60. Once his victims were in his vehicle, the defendant took them to his home, held them against their will, threatened them, physically abused them, and forced them to engage in various nonconsensual sex acts. Id. Both victims eventually escaped. On appeal, this Court held that consolidation of the charges

21

involving both victims was proper because, as was the case in <u>Wright v. State</u>, 516 So. 2d 941, 943 (Ala. Crim. App. 1987), "'[t]he two offenses were of the same or similar character and appeared to be part of a common scheme, design, or plan. [And t]he judge suggested at trial that evidence of each offense would have been admissible at the trial of the other, had separate trials been held.'" <u>Id.</u> at 1165 (quoting <u>Wright</u>, 516 So. 2d at 943).

Just as in <u>Bester</u>, the crimes committed against Lockett's five victims were sufficiently similar to warrant consolidation. In each instance, Lockett engaged with his victims either through online prostitution advertisements or by posing as an Uber driver. Once he contacted the victims, Lockett drove them to -- or arranged for them to meet him at -- an isolated area near one of his two houses. (R. 105-06, 111-12, 215-16, 220-22, 257-63, 320-26, 355-62, 519-33.) Once there, Lockett forced his victims to engage in nonconsensual sexual acts, and, each time, he anally penetrated the victims. (R. 119-21, 134-35, 232-34, 264, 327-28, 331-32, 357, 363, 377.) Lockett also used force, or threatened to use force, at some point during each assault and theft (R. 118-21, 232-36, 264, 327-28, 331-32, 370-71), and portions of each attack occurred

22

either in the outer portions, or behind, houses near Lockett's two homes (R. 118-19, 224-25, 261-63, 330, 360-62, 519-33). Finally, Lockett took personal items from each victim. (R. 119-21, 236, 266, 330-33, 373-74.) To be sure, there were nuanced differences in each of the sexual assaults and thefts, but Lockett's crimes were nonetheless sufficiently similar to warrant consolidation. Hinkle, 86 So. 3d at 449 (quoting United States v. Melendez, 301 F.3d 27, 35 (1st Cir. 2002)) ("Similar does not mean identical, and we assess similarity in terms of how the government saw its case at the time of indictment.").

Second, evidence of the offenses charged in each of the consolidated indictments would have been admissible in the other cases if they had been tried separately. From Lockett's obsession with anal sex -- including his unsolicited statement to S.K. that "his wife … gives him money to get women to have anal sex" (R. 325) -- to his use of a purple pistol consistent with the firearm stolen from L.S. in October 2019, the circuit court properly considered a number of factors that supported a finding that the evidence of Lockett's conduct toward each victim would have been admissible in separate trials.

In <u>Jones v. State</u>, 580 So. 2d 97, 97-98 (Ala. Crim. App. 1991), this Court found no error in the trial court's admission of evidence of a collateral rape to rebut a consent defense during a trial for sexual abuse and first-degree rape. In doing so, this Court clarified the rule regarding the admissibility of collateral rapes:

> "The case of <u>Fisher v. State</u>, 57 Ala. App. 310, 328 So. 2d 311 … ([Ala. Crim. App.] 1976), is cited in the A.L.R. annotation as support for the general rule that 'while [evidence that the defendant raped or attempted to rape another woman] is inadmissible where the only issue involved in the case is whether the act of intercourse was voluntary, such evidence is admissible for the purpose of showing lack of consent or the use of force if it also falls within one of the other exceptions to the general rule of inadmissibility.'"

<u>Id.</u> at 99 (quoting Timothy E. Travers, Annotation, <u>Admissibility, in Rape Case, of Evidence that Accused Raped or Attempted to Rape Person Other than Prosecutrix</u>, 2 A.L.R. 4th 330, 374 (1980)). But we further distilled the rule, explaining that "<u>Fisher</u> should not be construed as supporting the proposition that evidence of an unrelated collateral forcible rape of one other that the prosecutrix is admissible <u>solely</u> to rebut a defense of consent." <u>Id.</u> at 100. Instead, evidence of a collateral rape is "'admissible for the purpose of showing lack of consent or the use of force [because] it also falls within one of the other exceptions to the general

24

rule of inadmissibility,'" such as when the "'evidence also establishes a common scheme or plan on the part of the accused.'" Id. at 101 (citation omitted).

With those principles in mind, this Court held that the trial court had acted within its discretion when it admitted evidence of the defendant's collateral rape. Id. We reasoned that, "despite the differing facts of each particular offense," the "connection between the offense[s] … [was] sufficient to justify the admission of [the collateral victim's] testimony." Id. at 101-02. In committing both offenses, the defendant "employed the guise of going to his sister's home in order to lure a 'friend' to an isolated and wooded area of the county." Id. at 102-03. Moreover, the defendant used "either force or the threat of force upon both victims," and, "[a]fter having sexual intercourse, … attempted to make each victim perform fellatio." Id. at 103. Given those similarities, this Court concluded that the defendant "wanted sexual favors … [and] went about obtaining those favors in a particular manner and pursuant to a specific plan." Id.

Under Jones, the evidence of Lockett's attacks on the victims would have been admissible in each case had they been tried separately.

25

Initially, despite his contention that consent was not at issue (Lockett's brief at 40), Lockett asserted a consent defense during trial. During his testimony, he explicitly testified that his sexual encounters with L.S., C.P., and J.W. were consensual. (R. 558-59, 561-64, 572-76, 589-90.) And although he denied having any sexual contact with S.K. and K.R. (R. 597, 606-08), his counsel's cross-examination of those two victims questioned their testimony that their sexual contact with Lockett had been nonconsensual and insinuated that both women had engaged in consensual sex acts with Lockett in exchange for money.[6] (R. 336-39, 377.)   Thus, if the cases had been tried separately, evidence of the collateral attacks and thefts against the other victims would have been admissible to rebut Lockett's consent defense if they fell into one of the other exceptions to Rule 404(b)'s general exclusionary rule. In Lockett's case, the various attacks and thefts showed a common scheme or plan.

Under Rule 404(b), evidence of a defendant's other crimes "is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime

---

[6]Lockett's counsel also took a similar approach when cross-examining L.S. and J.W. (R. 129-30, 274-75.)

… were committed … pursuant to a single plan, design, pattern, scheme or system." 1 Charles W. Gamble, et al., McElroy's Alabama Evidence § 69.01(6) (7th ed. 2020). "This rule is applicable whether such plan, design, pattern, scheme, or system is narrow and specific in scope or is measurably broad and general in scope." Id. But the charged crime and the collateral crime must have some logical connection. Jones, 580 So. 2d at 101. In other words, "the crime charged and the collateral crime must have '"such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations."'" Id. (quoting Allen v. State, 478 So. 2d 326, 331 (Ala. Crim. App. 1985), quoting in turn Mayberry v. State, 419 So. 2d 262, 268 (Ala. Crim. App. 1982)).

Here, as in Jones, each of the sexual assaults Lockett committed against the five victims shared a sufficient logical connection to establish a common plan or scheme. Lockett lured his victims into an isolated area before sexually assaulting them, at least a portion of each attack took place in or behind houses close to his two houses, and he used either force or the threat of force at some point during each encounter. Lockett anally penetrated each victim and took at least one item of their personal

27

property. Lockett's use of a purple handgun, likely the same handgun taken from L.S., during the sexual assaults of J.W. and S.K., further connected the offenses. In sum, the evidence suggested that Lockett "wanted sexual favors … [and] went about obtaining those favors in a particular manner and pursuant to a specific plan." Jones, 580 So. 2d at 103. Then, when he was finished with each victim, Lockett would take some personal item from the victim.

Finally, nothing in the record suggests that Lockett suffered undue prejudice from the consolidation of the separate indictments. The way the State presented its case-in-chief was not convoluted. Evidence of Lockett's conduct with each victim was presented in a straightforward manner that overlapped very little with evidence related to the other victims, except, for example, the evidence relating to the purple handgun. Tariq-Madyun v. State, 59 So. 3d 744, 749 (Ala. Crim. App. 2010) (quoting Summerlin v. State, 594 So. 2d 235, 236-37 (Ala. Crim. App. 1991)) ("No prejudice results where, as here, the jury could easily separate the evidence of the separate crimes.").

Instead, the record shows that the circuit court took steps to mitigate any potential prejudice to Lockett. Specifically, the circuit court

28

twice read each indictment to the jury. (R. 693-702.) Not only that, but the circuit court grouped the indictments together by victim (R. 694), and the verdict forms provided by the court listed the victim to whom the charges applied (C. 46, 152, 258, 363, 466, 569, 670, 770, 872, 974, 1081; R. 702). Finally, the court instructed the jury that it was to consider each case individually:

> "Now we covered this a little bit in jury selection, but I will say to you that you are to look at each case individually. You are not to say because you have either convicted or acquitted the defendant on one case that, that goes for all charges. You are to take each and every case individually and make an individual determination as to the guilt or the innocence of the defendant for each charge."

(R. 704-05.) Given the circuit court's careful instructions, as well as its efforts to keep the discrete cases and verdict forms separated by victim, any risk of undue prejudice toward Lockett was avoided. King v. State, 518 So. 2d 880, 887 (Ala. Crim. App. 1987) ("By the nature of the evidence, i.e., simple and distinct, the separate verdict forms, and the trial court's instructions, we consider that it was easy for the jury to keep the evidence separate in their deliberations and, thus, that the danger of the jury's cumulating the evidence was substantially reduced."); Tariq-Madyun, 59 So. 3d at 750 (quoting Melendez, 301 F.3d at 36, quoting in

turn United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991)) (noting that the trial court's instructing the jury regarding its duty to consider each case separately and to determine whether the State met its burden of proof beyond a reasonable doubt "'"minimized any possible prejudice" from the joinder' of the separate counts"); see also Harrison v. State, 398 So. 3d 955, 974 (Ala. Crim. App. 2023) (recognizing that "we presume the jury followed the court's instructions").

The indictments consolidated for a single trial were related to Lockett's commission of similar offenses against five separate victims. Lockett's crimes were indicative of his employment of a common scheme or plan, and involved a unique purple handgun taken from L.S., and the simplicity of the evidence presented at trial, along with the steps taken by the circuit court, prevented any undue prejudice. Accordingly, the circuit court acted within its discretion when it consolidated the separate indictments, and Lockett is entitled to no relief as to this claim.

## II.

Lockett next argues that a video introduced by the State during its rebuttal case, used to rebut his testimony, should have been excluded

under Rule 403, Ala. R. Evid, because its prejudicial effect substantially outweighed its probative value. (Lockett's brief at 47-51.)

Before trial, the State notified Lockett and the circuit court of its intent to offer video footage depicting Lockett sodomizing an unidentified victim to establish his identity. (C. 1635-42.) The State alleged -- both in its notice and at the motions hearing -- that the footage depicted Lockett "anally penetrating" a woman in the back of a vehicle while the woman continually whimpered, cried, told Lockett he was hurting her, and repeatedly stated that she wished to stop. (C. 1635; R. 35-36.) It also noted that the footage showed Lockett's driver's license and a purple and black pistol lying in the car. (C. 1635-36; R. 35-36.) Lockett contended that the video was unduly prejudicial and that there were less prejudicial means to establish his identity. (R. 44-45, 48.) The circuit court, however, concluded that the video was admissible under the common-plan-or-scheme exception to establish Lockett's identity. (R. 49.)

During its case-in-chief, however, the State indicated that it would show only a portion of the video depicting the purple and black pistol and Lockett's driver's license and that it did not wish to admit the portion depicting Lockett sodomizing the unidentified victim. (R. 496-98.) Later,

31

when the video was played during the State's case-in-chief, only the portion of the video depicting the pistol and Lockett's driver's license was shown to the jury. (R. 539-40.)

During the defense's case-in-chief, however, Lockett testified that he had recorded his sexual encounter with C.P. because he typically recorded his sexual encounters to document that they were consensual:

> "I recorded it for my own purposes just in case situations like I'm going through now, as proof that I ain't do nothing out of line. That anything that I did, it was agreed upon and consensual. I knew I was giving them counterfeit money, but they didn't. But I knew it was counterfeit. I knew that if anything came back, that I would have proof to show this is what went on. This is how it happened. It didn't go how they said it went. I didn't force nobody to do anything. I didn't harm no one. I had no weapons. Bearing no weapons or anything. So that was the purpose of me recording it."

(R. 575-76.) On cross-examination, the State questioned Lockett regarding whether he would stop a sexual encounter if a woman protested in a manner like what was depicted on the video of the unknown victim. (R. 641-42.) Outside the presence of the jury, Lockett's counsel objected on the ground that the State was asking questions related to the portion of the video that had not been admitted into evidence. (R. 642-43.) The State clarified that it was asking this line of questions for impeachment purposes because, "on direct examination

32

when [Lockett's counsel] was questioning Mr. Lockett, he asked him if he recorded these encounters. Mr. Lockett said he did … so that he could protect himself from situations that he has found himself in currently." (R. 643.) It continued, "[t]he State is simply asking this line of questioning for impeachment purposes, because he's stating that the videos on his phone depict consensual sex." (R. 643.) The circuit court agreed with the State and allowed the line of questioning. (R. 643.) Lockett again confirmed that he would stop if a woman protested and that he recorded his sexual encounters for his own protection. (R. 645-49.)

After the defense rested its case, the State informed the circuit court that it planned to show the omitted portion of the video as rebuttal evidence:

> "[T]he State would like to put it to the Court's attention that the State is planning to call Investigator Short in rebuttal based on the testimony that this defendant gave on direct examination where he stated that he records any encounters with women. That he does that so that he wouldn't find himself in the position that he is currently in. He stated that I record as proof that I didn't do nothing out of line, and I didn't force anybody to do anything. I later asked him if he records these encounters to prove that these are consensual encounters to which the defendant said yes. Along with asking the defendant, 'When a woman says no during intercourse,

> does he stop?' To which he confirmed and agreed on all of those lines of questioning."

(R. 673-74.) Lockett's counsel objected, arguing, among other things, that the video was "highly prejudicial, and the prejudicial nature far outweighs any probative value, in that it has no probative value … regarding an element of the charge brought by any of the [five] women." (R. 674-75.) The State then clarified that it was "not offering [the video] into evidence. Rather, the State is offering this … for impeachment purposes consistent to defendant's statement that he records these encounters to protect himself and to show that these encounters are consensual." (R. 675.) The circuit court concluded that it would allow the video to be shown for impeachment purposes but that it would not be admitted into evidence because of its "graphic nature." (R. 675.) Again, the State confirmed it was not offering the video as substantive evidence, and the circuit court agreed to give a limiting instruction. (R. 677-78, 711.) The portion of the video depicting Lockett sodomizing the unidentified victim was subsequently played for the jury. (R. 683.)

Under these specific circumstances, the circuit court acted within its discretion when it allowed the State to show the footage of Lockett

34

sodomizing the unidentified victim to rebut his testimony. This is the case for two reasons.

First, the footage tended to show a self-contradiction in Lockett's testimony. Self-contradiction occurs when "proof is offered that the witness him or herself did or said something inconsistent with their own present testimony." 2 Charles W. Gamble, et al., McElroy's Alabama Evidence § 155.01 (7th ed. 2020). Put differently, "self-contradiction occurs when a witness is impeached by a showing that the witness made prior statements or performed prior acts that are inconsistent with the witness'[s] present testimony." Id. Particularly, "[a]n act of a witness which is inconsistent with the witness'[s] present testimony about a material matter is self-contradiction," and it may be proven for impeachment purposes by either asking the witness about the inconsistent act or proving it through extrinsic evidence. Id. at § 155.02(3).

The video footage contradicted Lockett's testimony in two key respects. Initially, the footage contradicted Lockett's repeated statements that he would stop a sexual encounter if the woman indicated that she was in pain or wished to stop. Contrary to his testimony at trial,

Lockett did not cease anally penetrating the unknown victim despite her constant whimpering and repeated pleas that Lockett stop. (C. 1635; R. 35-36.)

Moreover, the footage contradicted Lockett's testimony that he recorded his sexual encounters only to prove that they were consensual. Because the unknown victim's actions in the video suggest the encounter was nonconsensual, and because nothing in the record suggests that Lockett unintentionally recorded his encounter with the unknown victim, the jury could conclude that Lockett did not record the encounter to show that it was consensual. Instead, it could conclude that he made the recording to memorialize his sodomizing the unknown victim, thus contradicting his testimony. Tillis, 469 So. 2d at 1371 (quoting Sprinkle v. State, 368 So. 2d 554 (Ala. Crim. App. 1978), quoting in turn Norris, 429 So. 2d at 650) ("'The State may, in the discretion of the trial court, introduce in rebuttal any competent evidence which explains or is a direct reply to or a contradiction of material evidence by the defendant.'").

Second, the prejudicial effect of the video did not substantially outweigh its probative value. Under Rule 403, Ala. R. Evid., relevant evidence may be excluded "if its probative value is substantially

outweighed by the danger of unfair prejudice." But the question "is not simply whether [the defendant] was prejudiced by the admission of [the] video; indeed, 'all evidence against a defendant … [is] prejudicial.'" Harrison, 398 So. 3d at 970 (quoting Wilson v. State, 142 So. 3d 732, 812 (Ala. Crim. App. 2010)). Instead, "the question is whether there was a danger that unfair prejudice could result from the admission of the video and whether that danger was substantially outweighed by the video's probative value." Id. (emphasis omitted). Prejudice is unfair if it "has 'an undue tendency to suggest decision on an improper basis.'" Id. at 971 (quoting Ex parte Vincent, 770 So. 2d 92, 96 (Ala. 1999)). Finally, "'[a]ll impeachment evidence is prejudicial to some extent. It is only when the probative value of the impeachment evidence is substantially outweighed by its prejudicial impact that it should be excluded.'" Brand, 941 So. 2d at 324 (quoting Southern Energy Homes, Inc. v. Washington, 774 So. 2d 505, 516 (Ala. 2000)) (emphasis omitted). Except in rare and extreme circumstances, "'"a party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject."'" Peterson v. State, 388 So. 3d 716, 723 (Ala. Crim. App. 2023) (quoting

Minor v. State, 914 So. 2d 372, 397 (Ala. Crim. App. 2004), quoting in turn Ex parte D.L.H., 806 So. 2d 1190, 1193 (Ala. 2001)).

Lockett, through his own testimony, injected into the trial evidence related to his reasons for recording his sexual encounters and whether he would stop a sexual encounter if the woman indicated that she wished to stop. The video footage of the unidentified victim not only bore directly on those matters, but it explicitly contradicted his testimony related to those matters. Given that Lockett's actions in the footage so clearly contradicted his testimony, the footage was substantially probative for impeachment purposes. Moreover, any risk of unfair prejudice was properly mitigated by both the State and the circuit court. Specifically, the State made clear that it was offering the video only for impeachment purposes, not as substantive evidence. (R. 675, 677-78.) And the circuit court chose not to allow the footage into evidence so as to permit the jury to view it during deliberations. (R. 675.) Indeed, the circuit court instructed the jury that it could consider the video footage only for impeachment purposes. (R. 711.) For these reasons, the circuit court did not abuse its discretion when it allowed the State to present the video footage to rebut Lockett's testimony.

### III.

Finally, although neither party raises the issue, we must address the fact that Lockett's two convictions for first-degree robbery of C.P. violate his double-jeopardy rights, a claim implicating the circuit court's jurisdiction. See Heard v. State, 999 So. 2d 992, 1006-07 (Ala. 2007). In case number CC-21-347, Lockett was charged with two counts of first-degree robbery as to victim C.P. (C. 104.) The first count charged Lockett with the robbery of C.P. while Lockett was armed with a pistol "in the course of committing or attempting to commit a theft of one iPhone and/or one Social Security card and/or one insurance card and/or one credit card and/or an undetermined amount of the lawful currency of the United States of America." (Id.) The second count charged Lockett with the robbery of C.P., wherein Lockett caused serious physical injury to C.P. "in the course of committing a theft of one iPhone and/or one Social Security card and/or one insurance card and/or one credit card and/or an undetermined amount of the lawful currency of the United States of America." (Id.)

"It is well settled that '[a] single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple

39

convictions for the same offense." <u>Lynch v. State</u>, 229 So. 3d 260, 265 (Ala. Crim. App. 2016) (quoting <u>Ex parte Darby</u>, 516 So. 2d 786, 787 (Ala. 1987)). In <u>Lynch</u>, this Court reaffirmed the rule set forth in <u>Hurst v. State</u>, 86 Ala. 604, 6 So. 120 (1889), "as it applies to separate items of property taken from one victim in one act of theft." 229 So. 3d at 267. In <u>Craig v. State</u>, 893 So. 2d 1250, 1256 (Ala. Crim. App. 2004), this Court noted that "it is the use of force, or the threat of the use of force, against the person that constitutes the crime" of robbery, meaning that "the unit of prosecution is the act of violence against the person."

The Alabama Supreme Court has held that "where there are two different methods of proving the offense charged in one statute, they [do not] constitute separate offenses." <u>Sisson v. State</u>, 528 So. 2d 1159, 1162 (Ala. 1988). While this Court has recognized that "double-jeopardy principles are not violated when multiple convictions involving multiple victims are obtained from one criminal transaction," <u>Burnett v. State</u>, 155 So. 3d 304, 307 (Ala. Crim. App. 2013) (citing <u>Brooks v. State</u>, 973 So. 2d 380, 342 (Ala. Crim. App. 2007)), such is not the situation here. In

this case, Lockett's first-degree-robbery charges were different methods of proving the same criminal act of robbery committed against C.P.[7]

The indictment, as well as the evidence in case number CC-21-347, reflect that Lockett committed a single robbery of C.P. The State charged Lockett with first-degree robbery under two different legal theories permitting two separate evidentiary bases for a conviction -- that Lockett committed a theft against C.P. while armed with a deadly weapon and that he caused serious physical injury to C.P. while committing the same act of theft. For the reasons stated above, however, we hold that Lockett was twice placed in jeopardy by being indicted for and convicted of two separate charges of first-degree robbery when he committed only one crime against one victim. Consequently, we must reverse and remand as to case number CC-21-347. On remand, the circuit court must enter a new order, one that adjudges the defendant guilty of the single offense first-degree robbery as to C.P. and "sentences him for that single offense." Ex parte Rice, 766 So. 2d at 152-53.

---

[7]Although Lockett sexually assaulted C.P. on two different occasions, C.P. testified that on the second occasion Lockett "didn't take my stuff th[at] time, because he already had it." (R. 246.)

41

## Conclusion

For the foregoing reasons, the circuit court acted within its discretion when it consolidated the charges against Lockett and allowed the State to use the footage of Lockett sodomizing an unknown victim to impeach him. Accordingly, Lockett's convictions and sentences for first-degree rape, first-degree sodomy, sexual torture, first-degree robbery as to S.K. and J.W., and second-degree theft of property are affirmed. In case number CC-21-347, however, we must remand case number CC-21-347 for the circuit court to vacate one of Lockett's convictions for first-degree robbery against C.P., along with the accompanying sentence.

AFFIRMED AS TO CASE NUMBERS CC-21-377, CC-21-378, CC-21-1004, CC-21-1005, CC-21-1006, CC-21-1331, CC-21-1332, CC-21-1466, CC-21-1467, AND CC-21-1468; REVERSED AND REMANDED AS TO CASE NUMBER CC-21-347.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.